Lynn Switzer, District Attorney, Pampa, TX, for Appellee.

Before QUINN, C.J., and REAVIS, and CAMPBELL, JJ.

## ON STATE'S MOTION TO DISMISS

PER CURIAM.

Pending before the court is the State's motion to dismiss this appeal. Waynetta Demetris Roberson, appellant, perfected her appeal after being sentenced in open court on November 10, 2004. According to the State's motion and affidavit attached thereto, appellant disappeared during her trial and the trial continued in her absence. However, the record discloses that she was captured approximately three years later and returned to Wheeler County. So, too was she present for the pronouncement of her sentence in open court on the 10th of November. Though having been recaptured before the time period for perfecting an appeal began to run, the State argues that dismissal is appropriate under Texas Rule of Appellate Procedure 42.4. We disagree.

According to Rule 42.4, an appellate court "must dismiss an appeal on the State's motion, supported by affidavit, showing that the appellant has escaped from custody *pending appeal* and that to the affiant's knowledge, the appellant has not, within ten days after escaping, volun-tarily returned to lawful custody. . . ." TEX. R.APP. P. 42.4 (emphasis added). Here, while the record indicates that appellant escaped from custody during trial and the trial continued in her absence, the trial court did not pronounce sentence in open court until her capture and return to Wheeler County. Thereafter, she perfect-ed her appeal. In short, nothing before us illustrates that she had absconded for any period of time during which her appeal pended, and it is this fact that distin-guishes our situation from those in *Ike v. State*, 998 S.W.2d 323, 324 (Tex.App.-Houston [1st Dist.] 1999, no pet.) and *Williams v. State*, No. 05–03–01772–CR, 2004 WL 1110533 (Tex.App.-Dallas, May 19, 2004, no pet.) (not designated for publi-cation). In both *Ike* and *Williams*, the appellant remained at large after their tri-al counsel perfected appeal. *See McGee v. State*, 445 S.W.2d 187, 188 (Tex.Crim.App. 1969) (holding that escape before sentence does not affect the right of appeal nor jurisdiction of appellate court).

Because the elements of Rule 42.4 have not been satisfied, we deny the State's motion to dismiss.

---

**RAMCO OIL & GAS, LTD. and Ramco Energy PLC, Appellants/Cross–Appellees,**

v.

**ANGLO DUTCH (TENGE) L.L.C. and Anglo–Dutch Petroleum Internation-al, Inc., Appellees/Cross–Appellants.**

No. 14–04–00433–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 8, 2005.

Christopher M. Odell, Michael K. Swan, Houston, for appellants/cross-appellees.

Neil C. McCabe, John O'Quinn, Houston, for appellees/cross-appellants.

Panel consists of Chief Justice HEDGES and Justices FOWLER and FROST.

## ORDER

KEM THOMPSON FROST, Justice.

Appellants/cross-appellees Ramco Oil & Gas, Ltd. ("Ramco Oil") and Ramco Energy PLC ("Ramco Energy") have filed a motion under Rule 24.4(a) of the Texas

Rules of Appellate Procedure seeking appellate review of what they allege is an excessive amount of security required by the trial court to supersede the judgment from which they appeal in this case. For the reasons stated herein, we require that the amount of bond, deposit, or other security necessary to supersede the trial court's judgment be decreased as set forth below. To this extent, we grant in part the Rule 24.4(a) motion filed by Ramco Oil and Ramco Energy (hereinafter collectively referred to as the "Judgment Debtors"); otherwise, we deny this motion. We grant the emergency motion to lift this court's stay of execution on the trial court's judgment, filed by appellees/cross-appellants Anglo–Dutch (Tenge) L.L.C. and Anglo–Dutch Petroleum International, Inc. (hereinafter collectively referred to as the "Judgment Creditors").

## I. FACTUAL AND PROCEDURAL BACKGROUND

On April 1, 2004, the trial court signed an amended judgment against the Judgment Debtors and in favor of the Judgment Creditors. The Judgment Debtors are appealing this judgment, in which they have been held jointly and severally liable for $6.4 million in damages and jointly and severally liable with Halliburton Energy Services, Inc., for $9.8 million in attorney's fees as well as all costs of court.

Eight months after the trial court signed the amended judgment, the Judgment Debtors filed a motion asking the trial court to lower the amount of the bond needed to supersede this judgment to $200,000 and asserting that posting a bond in excess of this amount would cause the Judgment Debtors substantial economic harm. *See* TEX. CIV. PRAC. & REM.CODE ANN. 52.006(c) (Vernon Supp.2004) (stating that, on a showing by the judgment debtor that the judgment debtor is likely to suffer substantial economic harm if required to post security in an amount required under section 52.006(b), the trial court shall lower the amount of the security to an amount that will not cause the judgment debtor substantial economic harm); TEX.R.APP. P. 24.2(b) (stating that the trial court must lower the amount of security required by Rule 24.2(a) to an amount that will not cause the judgment debtor substantial economic harm if, after notice to all parties and a hearing, the court finds that posting a bond, deposit, or security in the amount required by Rule 24.2(a) is likely to cause the judgment debtor substantial economic harm).

After allowing discovery concerning the Judgment Debtors' net worth, the trial court heard the Judgment Debtors' motion on April 29, 2005. At the conclusion of that evidentiary hearing, the trial court signed an order setting the amount of bond, deposit, or security required to supersede the judgment (hereinafter "Security Amount") at $7.505 million, which the court determined was 50 percent of "Ramco's" 2003 net worth in U.S. Dollars. *See* TEX. CIV. PRAC. & REM.CODE ANN. 52.006(b) (Vernon Supp.2004) (stating that, notwithstanding any other law or rule of court, the Security Amount for a money judgment must not exceed the lesser of (1) 50 percent of the judgment debtor's net worth, or (2) $25 million); TEX.R.APP. P. 24.2(a)(1) (stating that, for a money judgment, the Security Amount must not exceed the lesser of (a) 50 percent of the judgment debtor's current net worth or (b) $25 million). In this order, the trial court also suspended enforcement of its April 1, 2004 judgment pending appellate review of the proper Security Amount. *See* TEX.R.APP. P. 24.4.

Days after the April 29 order, the Judgment Debtors filed in this court an emergency motion to review the order setting the Security Amount at $7.505 million.

*See* TEX. CIV. PRAC. & REM.CODE ANN. 52.006(d) (Vernon Supp.2004); TEX.R.APP. P. 24.4. The Judgment Debtors asked this court to lower the Security Amount to $200,000. The Judgment Debtors also requested this court to issue a temporary order staying execution on the judgment pending this court's resolution of the motion to review the Security Amount. *See* TEX.R.APP. P. 24.4(c). This court granted this relief and stayed execution on the judgment pending our decision on the motion. *See id.*

On June 24, 2005, the Judgment Creditors filed an emergency motion to lift this court's temporary stay based on the alleged threat that the Judgment Debtors would dissipate their assets. The Judgment Creditors also cited a change in the Judgment Debtors' financial condition since April 29, 2005. On June 28, 2005, this court ordered this case abated and remanded to the trial court for the taking of evidence and the entry of findings of fact. *See* TEX.R.APP. P. 24.4(d). Specifically, we ordered the trial court to conduct a hearing and make findings of fact and conclusions of law concerning the changes in circumstances, if any, concerning the Judgment Debtors' net worth. *See* TEX. R.APP. P. 24.3(a)(2) (trial court may modify amount of security if circumstances change); TEX.R.APP. P. 24.4(b) (review of the sufficiency or excessiveness of the amount of security may be based both on conditions as they existed at the time of the trial court's order and on changes in those conditions). In this order, we stated that the trial court must lower the Security Amount to an amount that will not cause the Judgment Debtors substantial economic harm if the court finds that posting the required bond is likely to cause substantial economic harm. TEX.R.APP. P. 24.2(b). Furthermore, we instructed the trial court that, when the trial court determines a judgment debtor's net worth for purposes of setting a Security Amount, the court must state with particularity the factual basis for its determination of the debtor's net worth. TEX.R.APP. P. 24.2(c)(3).

On July 21, 2005, the trial court conducted a hearing under this court's abatement order. After hearing evidence and the argument of counsel, the trial court issued findings of fact and conclusions of law stating, among other things, the following:

● The Judgment Debtors' financial condition has improved since the trial court set the Security Amount on April 29, 2005.

● "The net worth of Ramco," based on its market capitalization, is $20 million.

● Although a net worth of $20 million would ordinarily require a reduction in the Security Amount to $10 million, the trial court left the Security Amount needed to supersede the judgment at $7.505 million because the Judgment Creditors agreed that this amount was sufficient.

● Posting a $7.505 million supersedeas bond will not cause "Ramco" substantial economic harm.

● Changes in circumstances do not warrant a modification of the Security Amount set in the trial court's April 29, 2005 order.

## II. STANDARDS OF REVIEW

 We review the alleged excessiveness of the trial court's determination of the amount of security under Rule 24.4 of the Texas Rules of Appellate Procedure using an abuse-of-discretion standard. *See In re Kajima Intern., Inc.,* 139 S.W.3d 107, 112 (Tex.App.-Corpus Christi 2004, orig. proceeding). Likewise, we review the "substantial economic harm" determination under this standard. *See Isern v. Ninth Court of Appeals,* 925 S.W.2d 604,

606 (Tex.1996) (stating that trial court had discretion to allow alternate security under former Texas Rule of Appellate Procedure 47 and section 52.002 of the Texas Civil Practice and Remedies Code). Generally, the test for abuse of discretion is whether the trial court acted without reference to any guiding rules and principles or whether the trial court acted arbitrarily and unreasonably. *See McDaniel v. Yarbrough,* 898 S.W.2d 251, 253 (Tex.1995). However, a trial court has no discretion in determining what the law is and applying the law to the facts. *See Gonzalez v. Reliant Energy, Inc.,* 159 S.W.3d 615, 623–24 (Tex.2005). A failure by the trial court to analyze or apply the law correctly is an abuse of discretion. *Id.*

Furthermore, under section 52.006, the trial court's discretion is limited by the requirement that the Security Amount cannot exceed the limit set forth in section 52.006(b) or an amount that is likely to cause the judgment debtor substantial economic harm. *See* Tex. Civ. Prac. & Rem. Code Ann. 52.006(b), (c); *Bocquet v. Herring,* 972 S.W.2d 19, 20–21 (Tex.1998). Therefore, the trial court abuses its discretion if the evidence is legally or factually insufficient to support its findings under section 52.006(b) or (c). *See Bocquet,* 972 S.W.2d at 20–21; *Bass v. Walker,* 99 S.W.3d 877, 883 (Tex.App.-Houston [14 Dist.] 2003, pet. denied) (although court reviews sanctions under abuse-of-discretion standard, if there is legal or factually insufficient evidence to support the trial court's fact finding under the relevant legal standard, then the trial court abused its discretion); *Hunt v. Baldwin,* 68 S.W.3d 117, 135 n. 8 (Tex.App.-Houston [14th Dist.] 2001, no pet.).

As to the net-worth determination and the determination of whether the Judgment Debtors are likely to suffer substantial economic harm, the Judgment Debtors have the burden of proof. *See* Tex. Civ. Prac. & Rem.Code Ann. 52.006(c); Tex.R.App. P. 24.2(c)(3). Therefore, for the Judgment Debtors to show that the trial court abused its discretion as to these issues by ruling based on legally insufficient evidence, the Judgment Debtors must demonstrate that the evidence conclusively establishes, as a matter of law, all vital facts in support of their position. *See Dow Chemical Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001). In making this determination, we must consider evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id.,* 168 S.W.3d at 827. We must determine whether the evidence before the trial court would enable reasonable and fair-minded people to find the facts at issue. *See id.* The factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *See id.,* 168 S.W.3d at 819.

In determining whether the Judgment Debtors have shown that the trial court abused its discretion as to these issues by ruling based on factually insufficient evidence, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986). After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *GTE Mobilnet of S. Tex. v. Pascouet,* 61 S.W.3d 599, 615–

16 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). We may not substitute our own judgment for that of the trier of fact, even if we would reach a different answer on the evidence. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex. 1998).

### III. ANALYSIS

The issues at hand involve the recently amended section 52.006 of the Texas Civil Practice and Remedies Code and the recently amended Rule 24 of the Texas Rules of Appellate Procedure. No opinions or published orders appear to have addressed these issues.

### No Differentiation Between Judgment Debtors

Under section 52.006(b) of the Texas Civil Practice and Remedies Code, the cap on appellate security for money judgments is based on "the judgment debtor's net worth." TEX. CIV. PRAC. & REM.CODE ANN. 52.006(b). Therefore, the amount of security required of each jointly and severally liable defendant may be different. *See id.;* Elaine A. Carlson, *Reshuffling the Deck: Enforcing and Superseding Civil Judgments on Appeal After House Bill 4,* 46 S. TEX. L.REV. 1035, 1072 (2005). The trial court set the amount of supersedeas at $7.505 million without differentiating between the two Judgment Debtors.

### *Ramco Oil*

The trial court did not determine the net worth of Ramco Oil. The affidavit of the Judgment Debtors' group financial director, Steven Bertram, states that Ramco Oil is currently insolvent. The Judgment Creditors offered no contrary evidence. The affidavits of Bertram and Christopher G. Moar, Ramco Energy's Vice President

of Finance, state that Ramco Oil's net assets are 440 pounds sterling.[1] The audited financial statements of Ramco Energy for 2003 and 2004 were admitted in evidence before the trial court. They show that Ramco Oil is one of various subsidiaries of Ramco Energy. At his deposition, Bertram testified that Ramco Oil sold its interest in an oil and gas field for approximately 67 million pounds and that in 2003, Ramco Energy decided to use these profits to develop its interest in the Seven Heads gas field offshore Ireland. Bertram testified that, to this end, during 2003 Ramco Oil distributed substantially all of its assets to Ramco Energy by dividend. Moar testified at the July 2005 hearing that Ramco Oil's net assets had not changed in the past year. There is no evidence to the contrary in our record.

Bertram and Moar are interested witnesses. Testimony from interested witnesses may establish a fact as a matter of law only if the testimony could be readily contradicted if untrue, and is clear, direct, and positive, and there are no circumstances tending to discredit or impeach it. *See Lofton v. Texas Brine Corp.,* 777 S.W.2d 384, 386 (Tex.1989); *see also City of Keller v. Wilson,* 168 S.W.3d 802, 820 (Tex.2005) (stating that the factfinder cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted). The record reflects that the parties conducted net-worth discovery, including interrogatories, document production, and at least one deposition, that of Bertram. The Judgment Debtors produced various documents, including audited financial statements for 2003 and 2004 and various unaudited financial statements. We conclude that the testimony of Moar and Bertram as to the net worth of

---

**1.** All references in this opinion to "pounds" will be to pounds sterling.

Ramco Oil could be readily contradicted if untrue. The evidence that Ramco Oil's current net worth is 440 pounds is clear, direct, and positive. There are no circumstances tending to discredit or impeach this evidence. Reviewing the evidence under the applicable standard of review, we conclude that the evidence conclusively proves as a matter of law that the net worth of Ramco Oil is 440 pounds. Therefore, the trial court abused its discretion in determining that the proper Security Amount for Ramco Oil is $7.505 million. *See* TEX. CIV. PRAC. & REM.CODE ANN. 52.006(b); TEX.R.APP. P. 24.2(a)(1). Using the same 1.7 dollar-to-pound exchange rate used by the Judgment Creditors and the trial court, Ramco Oil's net worth is $748, and 50 percent of this amount is $374.[2] Therefore, the trial court erred in not setting the Security Amount for Ramco Oil at $374. *See* TEX. CIV. PRAC. & REM.CODE ANN. 52.006(b); TEX.R.APP. P. 24.2(a)(1).

### *Ramco Energy*

In its findings of fact and conclusions of law, the trial court based its determination that Ramco Energy's net worth is $20 million on Ramco Energy's market capitalization. For reasons explained below, the trial court erred as a matter of law in using market capitalization as its measure of net worth.

### Net Worth

Ramco Energy is a Scottish public limited company. Moar testified at the July 2005 hearing that the net worth of Ramco Energy, as of December 31, 2004, was 6.2

million pounds based on the company's annual report and audited financial statement[3] prepared by PricewaterhouseCoopers LLP. The court admitted in evidence an unaudited financial statement for Ramco Energy showing it had a net worth of approximately 5.2 million pounds as of May 31, 2005. The note on this financial statement indicated, and Moar testified, that based on the company's issuance of new share capital, its net worth had since increased by one million pounds, bringing the company's net worth as of the date of the hearing (July 21, 2005) to 6.2 million pounds. The Judgment Creditors' expert witness, Walter Bratic, took no exception to this audited financial statement and acknowledged that the net worth listed in the financial statement was the "net worth on a book basis, using generally accepted accounting principles." Thus, it was undisputed at the July 21 hearing that the net worth of Ramco Energy based on this definition of net worth was 6.2 million pounds.

Nonetheless, Bratic, the Judgment Creditors' expert, testified that, in his opinion the net worth of the company is about $20 million, "based on what the investing public says this company is worth." Bratic used market capitalization as his sole basis for determining Ramco Energy's net worth. Neither section 52.006(b) of the Texas Civil Practice and Remedies Code nor the part of Rule 24 that implements it contain a definition of "net worth."

We review the trial court's interpretation of applicable statutes de novo.

---

**2.** At the July 2005 hearing, counsel for Judgment Creditors stated that a 1.7 dollar-to-pound exchange rate was acceptable for converting the figure of 6.2 million pounds into dollars. The trial court also used this exchange rate in its findings of fact and conclusions of law.

**3.** Ramco Energy's Annual Report and Financial Statements for 2004 indicate that the consolidated financial statements were prepared in accordance with UK Generally Accepted Accounting Principles.

*See Johnson v. City of Fort Worth,* 774 S.W.2d 653, 655–56 (Tex.1989). In construing a statute, our objective is to determine and give effect to the Legislature's intent. *See Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex.2000). If possible, we must ascertain that intent from the language the Legislature used in the statute and not look to extraneous matters for an intent the statute does not state. *Id.* If the meaning of the statutory language is unambiguous, we adopt the interpretation supported by the plain meaning of the provision's words. *St. Luke's Episcopal Hosp. v. Agbor,* 952 S.W.2d 503, 505 (Tex.1997). We must not engage in forced or strained construction; instead, we must yield to the plain sense of the words the Legislature chose. *See id.*

 "Net worth" is a term used by laymen as well as professionals. Although it is a term of art in business and accounting, its meaning is the same in ordinary usage. Dictionaries define "net worth" as the amount by which resources exceed liabilities to creditors. *See, e.g.,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1519 (defining "net assets" as "the excess of value of resources over liabilities to creditors") & 1520 (defining "net worth" as a synonym of "net assets") (1993 ed.); *see also* ENCARTA WORLD ENGLISH DICTIONARY (defining "net worth" as "assets minus liabilities: the difference between assets and liabilities of a person or company."); INVESTOPEDIA (2000 ed.) (defining "net worth" as "the amount by which a company or individual's assets exceed their liabilities"). Law dictionaries assign the term the same meaning. *See* BLACK'S LAW DICTIONARY 1639 (8th ed.2004) (stating that "net worth" is usually calculated as excess of total assets over total liabilities); BLACK'S LAW DICTIONARY 939 (5th ed.1979) (defining "net worth" as the "[r]emainder after deduction of liabilities from assets"); MER-RIAM-WEBSTER'S DICTIONARY OF LAW (1996 ed.) (defining "net worth" as "the excess of the value of assets over liabilities"). Likewise, many courts considering the meaning of this term also have adopted this widely accepted definition.

For example, in holding that the plain meaning of "net worth" in the Equal Access to Justice Act is the difference between total assets and total liabilities determined in accordance with generally accepted accounting principles ("GAAP"), the United States Court of Appeals for the Seventh Circuit made the following observations:

> Congress did not define the statutory term "net worth." It seems a fair guess that if it had thought about the question, it would have wanted the courts to refer to generally accepted accounting principles. What other guideline could there be? Congress would not have wanted us to create a whole new set of accounting principles just for use in cases under the Equal Access to Justice Act. The proceeding to recover attorney's fees under the Act is intended to be summary; it is not intended to duplicate in complexity a public utility commission's rate of return proceeding.

*Continental Web Press, Inc. v. NLRB,* 767 F.2d 321, 323 (7th Cir.1985), *disapproved of on other grounds by, Comm'r, INS v. Jean,* 496 U.S. 154, 160–66, 110 S.Ct. 2316, 2319–23, 110 L.Ed.2d 134 (1990). Several federal courts of appeals also have held that the unambiguous meaning of "net worth" in federal statutes is the difference between total assets and total liabilities determined in accordance with GAAP. *See, e.g., Broaddus v. United States Army Corps of Eng'rs,* 380 F.3d 162, 166–67 (4th Cir.2004) (holding that unambiguous meaning of "net worth" under Equal Access to Justice Act is total assets less total liabilities according to GAAP); *Sanders v. Jack-*

*son,* 209 F.3d 998, 999–1002 (7th Cir.2000) (holding that plain meaning of "net worth" under Fair Debt Collection Practices Act is total assets less total liabilities according to GAAP, which is balance-sheet or book net worth); *Kuhns v. Board of Governors of Federal Reserve System,* 930 F.2d 39, 41–42 (D.C.Cir.1991) (holding that "net worth" under Equal Access to Justice Act must be calculated in accordance with GAAP); *see also Castelli v. Tolibia,* 83 N.Y.S.2d 554, 564 (Sup.Ct.1948) (stating that "net worth" has a well-defined meaning, which is the remainder after the deduction of liabilities from assets). Furthermore, in a federal case, the trial court allowed the judgment debtors to supersede a judgment in excess of $145 million by posting a $75 million bond and by making an initial and subsequent certifications that the net worth of one of the judgment debtors was in excess of three times the amount of the judgment. *Trans World Airlines, Inc. v. Hughes,* 314 F.Supp. 94, 97–98 (S.D.N.Y.1970). In that case, the trial court required the certification of the net worth of the judgment debtor in question to be in accordance with GAAP. *See id.* at 97. The plain meaning of "net worth," as used in section 52.006 of the Texas Civil Practice and Remedies Code and Rule 24, is the difference between total assets and total liabilities determined in accordance with GAAP.

Neither the Judgment Creditors nor their expert have identified any treatise or other authority to support the notion that a company's net worth is measured by market capitalization, yet the trial court equated market capitalization with net worth. Market capitalization and net worth are not the same thing. Market capitalization, often referred to as "market cap," is the sum derived from the current stock price per share times the total number of shares outstanding. INVESTOPEDIA (2000 ed.). It reflects the overall value of a company's stock and may be higher or lower than the company's net worth. Although market capitalization is an indication of the value of a company, our lawmakers chose net worth—not market capitalization—as the legal standard in section 52.006 of the Texas Civil Practice and Remedies Code. We must defer to the Legislature's selection of net worth as the applicable standard. Using this measure—the difference between total assets and total liabilities determined in accordance with GAAP— not only comports with the unambiguous terms of the statute, but also makes more sense in the context of assessing a judgment debtor's ability to post bond or other security. By using market capitalization as the standard for determining Ramco Energy's net worth, the trial court applied an incorrect legal standard and erred as a matter of law. *See Gonzalez,* 159 S.W.3d at 623–24.

The Judgment Creditors assert that the following two sentences from the legislative history of section 52.006 reveal a legislative intent to leave to the trial court the definition and determination of the "fluid concept" of net worth in any given case:

> There is no easy way to define "net worth," and it is important to give judges discretion to determine this on a case-by-case basis. If a plaintiff feels that a defendant is manipulating its assets to reduce the bond amount, the plaintiff can ask the judge to address this.

HOUSE RES. BILL ORG., BILL ANALYSIS, H.B. 4, 78th Leg., R.S., p. 46 (2003). We disagree with the Judgment Creditors' argument in this regard. Although trial courts have discretion under section 52.006 to determine the *amount* of a judgment debtor's net worth, they have no discretion to alter the meaning of the term "net worth." This statute does not make a trial court's

determination final, rather it subjects that determination to review by appellate courts. *See* TEX. CIV. PRAC. & REM.CODE ANN. 52.006(d); *In re Kajima Intern.,* 139 S.W.3d at 112. Section 52.006 also limits the trial court's factfinding in this regard to a determination of "50 percent of the judgment debtor's net worth." *See* TEX. CIV. PRAC. & REM.CODE ANN. 52.006(b)(1). The Legislature could have required the trial court to determine the Security Amount based on 50 percent of a judgment debtor's value, using whatever measure of value the trial court found to be most appropriate. However, the Legislature did not do so; instead, it required that the trial court base this determination on the judgment debtor's "net worth." While determining "net worth" under GAAP may be quite complicated and may involve different considerations based on the circumstances of the judgment debtor and based on GAAP, the unambiguous meaning of this term is the difference between total assets and total liabilities determined in accordance with GAAP.

We do not interpret the above-quoted legislative history to be contrary to the plain meaning of section 52.006. In any event, even if the legislative history stated that the trial court has unbridled discretion to determine the judgment debtor's net worth or that "net worth" has no fixed meaning or definition whatsoever, we would not be able to give effect to this legislative history because it would contradict the unambiguous language of the statute. *See Fleming Foods of Texas, Inc. v. Rylander,* 6 S.W.3d 278, 283–84 (Tex.1999) (holding that, although section 311.023 of the Texas Government Code states that courts may consider the legislative history of unambiguous statutes, the legislative history of a statute cannot be used to alter the unambiguous meaning of a statute, except for the rare instance in which it is used to show a typographical error); *St.*

*Luke's Episcopal Hosp.,* 952 S.W.2d at 505 (stating that courts need not resort to extrinsic aids in construing an unambiguous statute and that courts must find the legislature's intent as expressed in the language of the statute).

The Judgment Creditors also cite Justice Gonzalez's concurring opinion in *Wal–Mart Stores, Inc. v. Alexander. See* 868 S.W.2d 322, 329–32 (Tex.1993) (Gonzalez, J., concurring). In this concurring opinion, Justice Gonzalez lamented the Texas Supreme Court's failure to follow his suggestion in *Lunsford v. Morris* that the court define what "net worth" means in the context of the admission into evidence of a defendant's net worth for the purpose of determining what, if any, punitive damages should be assessed against that defendant. *See id.* at 330–31; *Lunsford v. Morris,* 746 S.W.2d 471, 472–73 (Tex.1988) (changing Texas common law and holding for the first time in Texas that evidence regarding a party's "net worth" is discoverable and admissible in evidence if punitive damages are sought against that party); *id.,* at 475 (Gonzalez, J., dissenting) (warning that practitioners will be confused because the majority does not define what "net worth" means and what types of evidence will be admissible to show "net worth"). Although Justice Gonzalez cites various cases as evidence of confusion among the courts of appeals as to the meaning of net worth in this context, the cases cited either deal with the scope of discovery regarding a defendant's net worth or recite the types of evidence of net worth that were admitted at trial, without discussing the propriety of admitting that kind of evidence. *See Alexander,* 868 S.W.2d at 330 (citing cases as evidence of confusion regarding the meaning of net worth).

In his concurring opinion in *Alexander,* Justice Gonzalez does not cite any cases

that determine the definition of "net worth" under the common-law requirement established by *Lunsford.* *See id.* Justice Gonzalez stated that, although it was not necessary to decide the matter in the case at hand, the court should have stated that gross sales are not admissible to prove net worth regarding this requirement but that evidence is admissible regarding net income and assets minus liabilities. *See id.* at 330–31. Justice Gonzalez stated that "[a] rule which limits admissibility only to assets minus liabilities may exclude relevant evidence and impede the goal of determining the true wealth of a defendant." *See id.* at 331. Although there was some disagreement among courts of appeals as to what matters fell within the scope of discovery as to this common-law issue of the net worth of a defendant against whom punitive damages are sought, the Texas Supreme Court never followed Justice Gonzalez's recommendation that it address the issue of the definition of "net worth" in this context. The parties have not cited, and we have not found, any cases addressing the definition of "net worth" under this common-law requirement.

In 1995, the Texas Legislature enacted a statute stating that, "[i]n determining the amount of exemplary damages, the trier of fact shall consider evidence, if any, relating to . . . the net worth of the defendant." Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, sec. 41.011, 1995 Tex. Gen. Laws 108, 112 (codified at TEX. CIV. PRAC. & REM.CODE ANN. § 41.011 (Vernon 1997)). The parties have not cited, and we have not found, any cases examining the meaning of "net worth" under section 41.011 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.011. Because this statute uses the phrase "evidence . . . relating to . . . the net worth of the defendant," there may be less reason to go into the definition of "net worth" under this statute. Section 52.006(b), by contrast, uses the precise language "50 percent of the judgment debtor's net worth." TEX. CIV. PRAC. & REM. CODE ANN. § 52.006(b). In sum, Justice Gonzalez's concurring opinion in *Alexander* does not change our analysis in this case.

Reviewing the evidence under the applicable standard of review and applying the plain meaning of the term "net worth," we conclude that the evidence conclusively proves as a matter of law that the current net worth of Ramco Energy is 6.2 million pounds. Counsel for the Judgment Creditors agreed at the July 2005 hearing that this amount is equivalent to $10.54 million, and the trial court so agreed in its findings of fact. Fifty percent of this amount is $5.27 million, and thus, the proper Security Amount for Ramco Energy under Rule 24.2(a)(1) is $5.27 million. The trial court abused its discretion in reaching its conclusion that the proper Security Amount required for Ramco Energy to supersede the judgment is $7.505 million. *See Gonzalez,* 159 S.W.3d at 623–24.

### Substantial Economic Harm

■ The term "substantial economic harm" is not defined by the statute. It is clear, however, that it is something less than "irreparable harm," the legal standard utilized before the recent statutory amendment. Though there is not yet case law construing the term, one noted scholar has observed:

The recent legislative modifications to supersedeas requirements effective as to cases in which a final judgment is signed on or after September 1, 2003, reflect a shift in concern from that of protecting the judgment creditor's ability to collect the judgment if affirmed on appeal, to protecting the judgment debtor from substantial economic harm by appellate

security requirements that may effectively preclude the ability to seek appellate review.

Carlson, 46 S. TEX. L.REV. at 1093.

■ In amending section 52.006, the Legislature struck a new balance between a judgment creditor's interest in protecting its judgment pending appeal and a judgment debtor's interest in having the ability to challenge the adverse judgment on appeal. Not only does the statute replace the "irreparable harm" standard for reducing security with "substantial economic harm," it also eliminates the requirement that the judgment debtor show harm "will" occur; now the evidence need only demonstrate that harm is "likely." Moreover, the statute no longer requires the judgment debtor to demonstrate that allowing lesser security will not substantially decrease the degree to which a judgment creditor's recovery would be secured, in order to obtain relief from the statutory Security Amount. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 52.002, 52.006 (Vernon 1997). This means the court need not consider how any reduction of the Security Amount might affect the judgment creditor's ability to recover under the judgment.

The thrust of the inquiry under section 52.006(c) is whether the judgment debtor has the ability to meet the supersedeas requirement as determined in 52.006(a) or (b) and whether doing so is likely to result in substantial economic harm. *See* TEX. CIV. PRAC. & REM.CODE ANN. 52.006. In conducting this analysis, the trial court has the flexibility to take into account a number of factors that could affect the judgment debtor's ability to post bond or other security based on the facts and circumstances specific to the case. This inquiry, however, should not focus on the market capitalization of the company or its value as a whole but on the judgment debtor's actual ability to post the security required. In other words, the court should be less concerned with what price the company might fetch in the marketplace if sold today and more concerned with the company's available resources and its ability to use them to post security. *How much cash or other resources would it take to post a supersedeas bond in the amount in question? Does the judgment debtor have sufficient cash or other assets on hand to post a supersedeas bond in this amount or to post a deposit in lieu of bond in this amount? Does the judgment debtor have any other source of funds available? Does the judgment debtor have the ability to borrow funds to post the requisite security? Does the judgment debtor have unencumbered assets to sell or pledge? What economic impact is such a transaction likely to have on the judgment debtor? Would requiring the judgment debtor to take certain action likely trigger liquidation or bankruptcy or have other harmful consequences?* These are the sort of inquiries that tend to reveal whether a judgment debtor is likely to suffer substantial economic harm. Given the new statutory framework, the drain on the judgment debtor's resources caused by the attorney's fees and other costs of appealing the judgment could also be a legitimate factor to consider in determining whether the judgment debtor is likely to suffer substantial economic harm.

The trial court found that posting a supersedeas bond in the amount of $7.505 million will not cause substantial economic harm to Ramco Energy. We presume that the trial court also found that posting a bond, deposit, or security in the amount of $5.27 million will not likely cause substantial economic harm to Ramco Energy. The Judgment Debtors presented some evidence that, if the trial court found it credible and reliable, might have been suf-

ficient to support a finding by the trial court that Ramco Energy is likely to suffer substantial economic harm if required to post security in the amount of $5.27 million. Nonetheless, the issue is whether the trial court abused its discretion because the Judgment Debtors conclusively proved this issue as a matter of law or because the trial court's contrary finding is so against to the overwhelming weight of the evidence as to be clearly wrong and unjust.

Both in their affidavits and in their hearing testimony, Bertram and Moar testified that posting security in an amount greater than $200,000 would cause Ramco Energy substantial economic harm. The Judgment Creditors' only witness, Bratic, did not controvert this testimony.[4] Therefore, this testimony from the Judgment Debtors' witnesses was uncontroverted. However, this does not necessarily mean that the Judgment Debtors conclusively proved substantial economic harm as a matter of law. *See Lofton,* 777 S.W.2d at 386 (stating that testimony from interested witnesses may establish a fact as a matter of law only if the testimony could be readily contradicted if untrue, and is clear, direct, and positive, and there are no circumstances tending to discredit or impeach it); *see also City of Keller v. Wilson,* 168 S.W.3d 802, 820 (Tex.2005). Without detailing all of the evidence supporting Ramco Energy's arguments in favor of substantial economic harm, we note the following:

● Ramco Energy introduced no · evidence of any efforts on their part to obtain a supersedeas bond or of what the premium, other costs, and re-

quired collateral, if any, would be to obtain a supersedeas bond in the amount of $7.505 million or in any other amount. A surety on a supersedeas bond may choose to require the judgment debtor/principal on the bond to post 100 percent security for its obligations under the supersedeas bond; however, sureties are not required to do so. Bertram and Moar seem to presume without explanation that 100 percent security would be required. They state in their affidavits that Ramco Energy has only $200,000 available to post supersedeas and then they later testify that Ramco Energy can only post a supersedeas bond in the amount of $200,000. Ramco Energy has introduced no evidence to show, under current market conditions, the highest amount of a supersedeas bond it could obtain with $200,000.

● Bertram and Moar concluded that posting more than a $200,000 supersedeas bond would cause Ramco Energy substantial economic harm. However, they did not conduct an analysis of the maximum Security Amount that Ramco Energy could post without being likely to suffer substantial economic harm and then determine that this amount was $200,000. Rather, Bertram testified that this $200,000 figure is based on the amount of money that was frozen in Ramco Energy's accounts at the Bank of Scotland by the arrestment and inhibition[5] that the Judgment Creditors obtained in November 2004, in the Court of Session at Edinburgh, Scotland. Ramco En-

---

4. When asked if posting a $7.5 million bond would cause substantial economic harm to Ramco Energy, Bratic did not answer the question but instead offered his observation that interests in seven properties could be placed in the registry of the court.

5. Under Scots law, an inhibition is an order issued by the Court of Session to prohibit a debtor from encumbering or alienating the debtor's heritable property to the prejudice of a creditor. *See* BLACK'S LAW DICTIONARY 799 (8th ed.2004).

ergy has not explained why the amount of funds that happened to be frozen in its accounts with the Bank of Scotland correlates with the maximum Security Amount that will not be likely to cause it substantial economic harm. There was testimony that the arrestment and inhibition would not apply to any funds that Ramco might deposit with the Bank of Scotland after the date the arrestment and inhibition went into effect.

- In their affidavits, Moar and Bertram testified that Ramco Energy owns the office building in which its headquarters are located in Aberdeen, Scotland and that this building is unencumbered. During his hearing testimony, Bertram noted that this building was subject to the arrestment and inhibition obtained by the Judgment Creditors; however, the Judgment Creditors' counsel noted in the trial court that the Judgment Creditors are willing to lift the arrestment and inhibition to the extent that Ramco Energy would use the covered assets to supersede the judgment. (Indeed, the $200,000 that Ramco Energy proposes to use to supersede the judgment is covered by the arrestment and inhibition.) Moar testified at the July 2005 hearing that Ramco Energy purchased this office building in 2000 for approximately 1.4 million pounds and that he did not know the current value of that building because he is not a property valuation expert.[6] The trial court could have based its ruling in part on the availability of this unencumbered office building with a book value of approximately $2.38 million.[7] Ramco Energy offered no evidence as to how much money it could borrow by pledging its title to this building. Ramco Energy did not offer evidence as to the amount of supersedeas bond a surety would agree to sign if Ramco Energy pledged this building as collateral.

- Ramco Energy has seven unencumbered interests in oil and gas properties that have no proven reserves—five in Ireland, one in Montenegro, and one in Bulgaria. By the July 2005 hearing, there was evidence that Ramco Energy had entered into farmout arrangements as to two of these interests. Further, Bertram and Moar testified that Ramco Energy cannot obtain loans on interests that have no proven reserves. However, there was no testimony as to whether these interests could be sold to generate funds to post security. Regarding this possibility, Bertram testified at the April 2005 hearing that he was "not sure how easy that would be to do or how quickly that could be done." At the July 2005 hearing, Moar was asked, "Is it possible to raise any money in connection with an asset like that [an unproven asset]?" Moar responded, "I don't believe so." Moar, however, also testified that he is not qualified to value oil and gas assets. The Judgment Debtors did not conclusively prove that these seven prop-

---

6. Moar also testified at the July 2005 hearing that the Bank of Scotland holds a "floating charge" on the office building that is similar to a "mortgage debenture." Even if we presume that Moar testified at the hearing that the Bank of Scotland holds a mortgage lien on the office building, the trial court was free to credit the original affidavit testimony of Bertram and Moar that the office building is an unencumbered asset, and we presume the trial court did so.

7. All conversions from pounds to dollars are based on a 1.7 dollar-to-pound exchange rate used by the Judgment Creditors and trial court below.

erties cannot be sold to generate funds to post security.[8]

- Although Ramco Energy emphasized its outstanding debt of approximately 75 million pounds to the Bank of Scotland relating to the Seven Heads gas field, the evidence shows that all but 12 million pounds of this debt is non-recourse debt that is secured only by the 86.5 percent interest of the Ramco group in this gas field. Although 12 million pounds is secured by the stock of Ramco Energy's profitable oil services subsidiary, Ramco Energy did not introduce evidence that this subsidiary could not service this 12 million pounds obligation or that it was not worth 12 million pounds.

- In Ramco Energy's 2004 annual report, its Executive Chairman informs the shareholders that "[t]he objective is to be debt free by the end of 2005...."

- Ramco Energy's 2004 audited financial statement shows that in 2004, its four executives received an aggregate salary of 1.095 million pounds or $1.861 million. The same statement also shows that these four executives received a total compensation in 2004 of 1.39 million pounds or $2.363 million.

In light of the above considerations, we conclude that the testimony of interested witnesses Bertram and Moar does not satisfy the *Lofton* standard for conclusive evidence. Accordingly, the testimony of these witnesses did not conclusively prove that Ramco Energy will likely suffer substantial economic harm if it is required to post security in an amount greater than $200,000. *See Lofton,* 777 S.W.2d at 386; *see also City of Keller,* 168 S.W.3d at 820. Under the applicable standard of review, we determine that there is legally and factually sufficient evidence to support the trial court's implied finding that Ramco Energy is not likely to suffer substantial economic harm if required to post $5.27 million in security. On this record, the trial court did not abuse its discretion in impliedly making this determination.

## IV. Conclusion

The trial court abused its discretion in determining the proper Security Amount as to both Ramco Oil and Ramco Energy. Specifically, the trial court erred in equating net worth with market capitalization. The plain meaning of "net worth," as used in section 52.006 of the Texas Civil Practice and Remedies Code and Rule 24, is the difference between total assets and total liabilities determined in accordance with GAAP. Under this plain meaning, the evidence conclusively proves that the net worth of Ramco Energy is $10.54 million (6.2 million pounds) and the net worth of Ramco Oil is $748 (440 pounds). Therefore, the trial court abused its discretion in not determining that the cap under section 52.006(b) is $5.27 million for Ramco Energy and $374 for Ramco Oil.

On this record and under the applicable standard of review, the trial court did not abuse its discretion in impliedly finding that Ramco Energy is not likely to suffer substantial economic harm if required to post $5.27 million in security. To date,

---

8. In its findings, the trial court stated that the Judgment Debtors could tender title to these seven interests into the registry of the court as alternate security to supersede the trial court's judgment and that doing so would not cause the Judgment Debtors substantial economic harm. The trial court indicated at the July 21, 2005 hearing that the Judgment Creditors agreed that these interests would be sufficient alternate security. Because the Judgment Debtors have not sought to supersede the judgment with this nonmonetary alternate security, this issue is not before us, and we do not address it.

Ramco Oil has not asserted that it is likely to suffer substantial economic harm if required to post $374 in security; however, in the unlikely event Ramco Oil wishes to do so, it is free to file a Rule 24.2(b) motion in the trial court.

Accordingly, we require that the amount of bond, deposit, or other security necessary to supersede the trial court's judgment be **DECREASED** to $374 for Ramco Oil and **DECREASED** to $5,270,000 for Ramco Energy. To this extent, we **GRANT IN PART** the Judgment Debtors' Rule 24.4(a) motion; otherwise, we **DENY** this motion. We **GRANT** the Judgment Creditors' emergency motion to lift this court's stay of execution on the judgment in its favor. It is therefore **ORDERED** that this court's May 10, 2005 order staying execution against Ramco Oil & Gas, Ltd., and Ramco Energy PLC on the Amended Final Judgment signed April 1, 2004, in trial court cause number 2000–22588 in the 61st District Court of Harris County, styled *Anglo–Dutch (Tenge) L.L.C. and Anglo Dutch Petroleum International, Inc. v. Ramco Oil & Gas, Ltd., Ramco Energy PLC, Golden Eagle Partners S.a.r.i., Golden Eagle Partnership, L.C., Central Asian Investments, N.V., Halliburton Energy Services, Inc., Bruce Kososki and Fred Tresca* is vacated and this **STAY IS LIFTED.** We note however that the trial court's April 29, 2005 order suspended enforcement of the trial court's judgment pending completion of appellate review under Rule 24.4. Today's order does not affect this suspension of enforcement by the trial court.

Chief Justice HEDGES not participating.