**Motion to Dismiss Denied; Affirmed in Part and Reversed in Part; Remanded; and Majority and Concurring Opinions filed February 14, 2012.**



In The

# Fourteenth Court of Appeals
_____

## NO. 14-08-00700-CV
_____

**R.M. SPRAGUE, Appellant**

**V.**

**D.L. SPRAGUE, Appellee**

**On Appeal from the 257th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2005-48988**

## MAJORITY OPINION

In this divorce appeal, appellant Robert ("Bob") Sprague challenges the jury's findings and the trial court's property division and post-judgment sanctions, while appellee Deborah Sprague moves that we dismiss the appeal, arguing that Bob accepted the benefits of the divorce judgment and is estopped from appealing it.

Finding no estoppel, we deny Deborah's motion.

In his appeal of the property-division portion of the divorce decree, Bob contends that the trial court misapplied the law, submitted an erroneous jury charge, improperly

disregarded jury findings, and abused its discretion in excluding evidence. He argues that as a result of these alleged errors, the trial court divested him of his separate property. We conclude that the characterization of a lump-sum distribution received during the marriage under two defined-benefit plans is governed by former section 3.007(a) of the Texas Family Code; we accordingly hold that the trial court did not err in instructing the jury in accordance with the statute or in failing to characterize a larger portion of the lump-sum distribution as Bob's separate property.

On the other hand, we agree that the trial court abused its discretion in excluding all evidence that any portion of the amounts payable to Bob under his employer's "Cash Deferral Program" was Bob's separate property.

Bob also appeals a post-judgment sanctions order and temporary orders pending appeal. We agree that the trial court abused its discretion in sanctioning Bob for a claimed delay in transferring certain funds to Deborah and in awarding Deborah attorneys' fees.

We accordingly reverse the property-division portion of the divorce decree, as well as the post-judgment sanctions order and the associated temporary order pending the appeal of the sanctions order, and we remand the case for (a) a determination of the community- and separate-property interests in the amounts that have been or will be paid to Bob as a result of his participation in his former employer's Cash Deferral Program, and (b) a just and right division of all of the community property.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Bob began working for Shell Oil in July 1967. On January 1, 1984, he was promoted to a position on the "Senior Staff" of the company, and in 1985, Shell merged with Royal Dutch Shell Group. After working for Shell for eighteen years, Bob married Deborah on July 6, 1985; eighteen years later, he retired on June 30, 2003.[1] He receives retirement benefits from Shell through three different plans: the basic pension plan, the

---

[1] Deborah retired from Shell before the marriage.

Benefit Restoration Plan, and the Senior Staff Plan. Under the basic pension plan, Bob receives monthly payments of $8,755.[2] Bob's benefits under the Benefit Restoration Plan and the Senior Staff Plan were paid in one lump sum of $7,230,035 in the form of a credit to Bob's account in the Senior Staff Savings Fund.

Upon reaching the age of 65 in 2010, Bob also received the first of ten equal annual payments through Shell's Cash Deferral Program. The payments are equal to certain bonuses Bob was awarded in 1985, 1986, and 1987, together with compound interest of 17% on the deferred bonus payments.

## A.    Course of Proceedings through Trial

Bob filed for divorce on July 29, 2005, and on September 13, 2007, the trial court issued an agreed docket-control order scheduling the case for trial on January 22, 2008 and setting a number of discovery deadlines. In accordance with the docket-control order, Bob amended his petition to allege that he owned separate property. He produced the initial and first supplemental report of his forensic-accounting expert, Patrice Ferguson, in accordance with the order, but produced her second supplemental report after the deadlines governing expert reports had passed. He served supplemental discovery responses on December 21, 2007, which was the deadline specified in the docket-control order.

At the January trial setting, the trial court granted Deborah's motion to exclude the second supplemental expert report and continued the trial until March 2008. On the second day of the jury trial in March 2008, Deborah successfully moved to exclude all evidence that any portion of the amounts payable to Bob under Shell's Cash Deferral Program is his separate property.

The jury found that the value of Bob's separate-property interest in the lump-sum distribution of benefits due under Shell's Benefit Restoration Plan and Senior Staff Plan

---

[2] The characterization of this benefit is not challenged on appeal.

3

was $1,807,509, an amount that is equal to 25% of the lump-sum distribution. Other findings of the jury are not challenged on appeal. Because the trial court excluded all evidence that any portion of the payments he would receive through the Cash Deferral Program is his separate property, the jury was not asked to determine the value of any such separate-property interest.

## B.     Rendition and Sanctions

After receiving the jury's verdict, the trial court issued a letter of rendition on March 31, 2008. Among other things, the trial court ordered that the Shell Senior Staff Savings fund "shall be sufficiently liquidated" to net Deborah $4,561,575 as "expeditiously as possible." On May 2, 2008, Bob's attorney told the court that they had not yet started the liquidation process because they were afraid that the liquidation could be a violation of the temporary injunction in effect. The trial court signed an order authorizing Bob to liquidate an unspecified portion of the funds in the account sufficient to net the amount due to Deborah. The same day that the trial court signed the order, Bob instructed Shell to liquidate $8.2 million from the account. This produced net proceeds of $5,379,200, but due to mail delays, Bob did not receive a check for the funds for nearly a month. The day he received the check, however, he ordered the funds deposited and Deborah's share wire-transferred to her. As a sanction for Bob's alleged delay in complying with the trial court's letter of rendition, Deborah asked the trial court to award her an amount equal to the interest she might otherwise have earned on the funds if they had been transferred to her on the date of rendition. The trial court accordingly ordered Bob to pay Deborah interest of $34,323.70 and to pay her attorney $15,100.00 for the attorneys' fees she incurred in the trial court in obtaining the order. In an associated temporary order pending appeal, the trial court ordered Bob to pay an additional $15,000.00 for attorneys' fees in the event that he unsuccessfully appealed the sanctions order.

4

## C. Post-Judgment Events

The trial court signed the final decree of divorce on June 16, 2008 and evenly divided the community property, which it found included all of the marital estate with the exception of the property that the parties had stipulated was separate property, and the $1,807,509 portion of the lump-sum retirement benefits that the jury found was Bob's separate property.

Both parties moved for temporary orders pending appeal. Although Bob did not appeal the portion of the property division as it pertained to certain stock and stock options, the trial court ordered Bob to post a $2,675,236 bond or cash equivalent as security for the stock options and stock appreciation rights awarded to Deborah. In addition, the trial court conditionally awarded Deborah $150,000 in attorneys' fees in the event that Bob's appeal of the property division was unsuccessful. While the appeal was pending, Deborah served Bob with discovery to gather evidence in support of a motion to dismiss the appeal. The trial court ordered Bob to comply.

## II. MOTION TO DISMISS

We first address Deborah's motion to dismiss this appeal on the ground that Bob has accepted the benefits awarded to him in the divorce decree. *See Carle v. Carle*, 149 Tex. 469, 472, 234 S.W.2d 1002, 1004 (1950) (explaining that a party who accepts the benefits of a judgment is estopped from appealing it); *Waite v. Waite*, 150 S.W.3d 797, 803 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (same). Under the acceptance-of-benefits doctrine, "[a] litigant cannot treat a judgment as both right and wrong, and if he has voluntarily accepted the benefits of a judgment, he cannot afterward prosecute an appeal therefrom." *Carle*, 149 Tex. at 472, 234 S.W.2d at 1004. The burden is on the appellee to establish that the appellant has accepted the benefits of a judgment. *Waite*, 150 S.W.3d at 803. If the appellee meets this burden, then the burden shifts to the appellant to show that one of the exceptions to the doctrine applies. *Id.* at 803–04. The doctrine does not apply when the appellant accepted the benefit of the judgment due to economic necessity,

5

*id.* at 803, or when the appeal affects only the appellant's right to further recovery. *Carle*, 149 Tex. at 472, 234 S.W.2d at 1004. The doctrine also does not apply if the "benefit accepted" was cash, the use of which would not prejudice the appellee. *Demler v. Demler*, 836 S.W.2d 696, 698 (Tex. App.—Dallas 1992, no writ), *disapproved on other grounds*, *Dallas Mkt. Ctr. Dev. Co. v. Liedeker*, 958 S.W.2d 382, 386 (Tex. 1997).

Deborah contends that Bob accepted the benefits of the judgment by liquidating an excessive portion of his Senior Staff Savings Fund and retaining the net proceeds. According to Deborah, this conduct began after the trial court issued its rendition letter on March 31, 2008 requiring Bob to liquidate a portion of the fund sufficient to net $4,561,575 to be transferred to Deborah. Of the approximately $24.5 million in the account at the time of the divorce, Bob ordered $8.2 million liquidated, which resulted in an additional $817,625 being transferred to him. Between that time and the date of Deborah's motion to dismiss in this court, Bob liquidated an additional $8.2 million from the account, placing the net proceeds of $5,330,000 into his checking account.

Deborah also argues that Bob has accepted the benefits of the judgment by retaining one-half of the automatic annual payments that he began receiving at age 65 under the Cash Deferral Program. These payments had been characterized as community property, half of which was awarded to Bob and half of which was to be paid to Deborah. Bob did not transfer half of the funds to Deborah, but paid that portion into the registry of the trial court. He retained the remaining half of this payment.

We conclude, however, that given the facts and procedural posture of this case, the acceptance-of-benefits doctrine does not require us to dismiss the appeal. First, Bob superseded the judgment. *Raymond v Raymond*, 190 S.W.3d 77, 80 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (when an appealing party posts a supersedeas bond[3] to suspend judgment, there is no "acceptance of benefits"). Second, the temporary orders pending

_____

[3] Deborah argues that the bond is insufficient but she has not asked the trial court or this court to increase it.

appeal in this case allow the parties to pay attorneys' fees, to use money in their possession for reasonable and necessary living expenses, to manage and invest the financial assets to preserve capital, and to transfer financial assets from one financial account to another. When such temporary orders are in place, the acceptance of benefits doctrine does not apply. *McAlister v. McAlister*, 75 S.W.3d 481, 483–84 (Tex. App.—San Antonio 2002, pet. denied); *Waite*, 150 S.W.3d at 807, n.13. We accordingly deny Deborah's motion to dismiss.

### III.  DIVISION OF PROPERTY

In a divorce decree, the trial court must divide the community property "in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." TEX. FAM. CODE ANN. § 7.001 (West 2006). Among these rights is the right to separate property. Under both the Texas Constitution and the Texas Family Code, a person has a separate-property interest in all property that the person "owned or claimed" before the marriage or acquired during the marriage by gift, devise, or descent. TEX. CONST. art. XVI, § 15; TEX. FAM. CODE ANN. § 3.001. Community property, on the other hand, consists of all of the property, other than separate property, acquired by either spouse during marriage, and all property possessed by either spouse during the marriage or at its dissolution is presumed to be community property. TEX. FAM. CODE ANN. §§ 3.002, 3.003(a). A litigant can overcome this presumption by tracing property and presenting clear and convincing evidence that it is one spouse's separate property. *Pearson v. Fillingim*, 332 S.W.3d 361, 636 (Tex. 2011). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

We will not disturb the property division on appeal unless the appellant demonstrates that the trial court clearly abused its discretion by a division or an order that is

manifestly unjust and unfair. *See Stavinoha v. Stavinoha*, 126 S.W.3d 604, 607 (Tex. App.—Houston [14th Dist.] 2004, no pet.). Under this standard, neither legal nor factual insufficiency of the evidence is an independent ground of error, but each instead is a relevant factor in assessing whether the trial court abused its discretion. *Id.* at 608. When we review the legal sufficiency of a separate-property finding, we consider all of the evidence in the light most favorable to the finding and determine whether a reasonable jury could have formed a firm belief or conviction that its finding was true. *Id.* We resolve all conflicts in the evidence in favor of the finding if a reasonable juror could do so, and disregard all contrary evidence unless a reasonable juror could not. *Id.* When we review the factual sufficiency of a separate-property finding, we will uphold the finding unless, "in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed [the] firm belief or conviction" reflected in the finding. *Id.*

## A.    Characterization of Lump-Sum Distribution

The jury found that the value of Bob's separate-property interest in the lump-sum distribution of benefits due under the Benefit Restoration Pension and the Senior Staff Pension Plan was $1,807,509, an amount that is equal to 25% of the lump-sum distribution of $7,230,035. Bob presents three issues challenging the jury's finding. First, he asserts that half of the lump-sum distribution (i.e., $3,615,018) is his separate property because, as a matter of law, the community-property interest in this benefit must be determined by applying the time-allocation rule established in *Taggart v. Taggart*, 552 S.W.2d 422 (Tex. 1977). Second, he contends that the trial court erred in instructing the jury using language based on the language of former provisions of Texas Family Code section 3.007 rather than language drawn from *Taggart*. And third, he argues that the repealed subsections of section 3.007 were applied in a manner that unconstitutionally divested him of his separate property. We address these issues together.

8

### 1.    *Taggart v. Taggart*

Under *Taggart*, courts calculated the community-property interest in retirement benefits by dividing the number of months during which marriage and employment coincided by the number of months of employment. *Id.* at 424. Bob and Deborah were married during half of the time that Bob worked for Shell; thus, if the division of his retirement benefits is governed by *Taggart*, then half of the lump-sum distribution is community property and half is Bob's separate property.

### 2.    *Berry v. Berry*

This approach changed when the Texas Supreme Court decided *Berry v. Berry*, 647 S.W.2d 945 (Tex. 1983). There, the court stated that *Taggart* addressed the extent of the community interest in retirement benefits, but not the value of the community-property interest. *Id.* at 946. The court explained that when determining the community-property interest, the value of retirement benefits is calculated as of the date of divorce. *Id.* (citing *Herring v. Blakely*, 385 S.W.2d 843, 845 (Tex. 1965)).

The *Berry* court dealt with a concern not addressed in *Taggart*, namely, the effect of pay increases in the later years of employment on defined-benefits that are calculated based not only on length of service, but also on compensation. Retirement benefits calculated this way do not accrue equally across the span of employment if compensation changes; in *Berry*, for example, the value of the payments available under such a defined-benefit plan more than quadrupled in the last third of the employed spouse's career. *Id.* In recognition of this effect, and in an effort to better safeguard the working spouse's separate-property interests, the *Berry* court limited the community's interest to the benefits that accrued during the marriage. To do so, the court calculated the payments that hypothetically would have been due if, on the date that the employed spouse's marital status changed, the benefits were vested and matured and he retired. *Id.* In other words, the *Berry* court "avoided the difficulties of computing a present value by employing a fiction to retire the employee spouse under the plan provisions on the date of divorce."

Steven R. Brown, Comment, *An Interdisciplinary Analysis of the Division of Pension Benefits in Divorce and Post-Judgment Partition Actions: Cures for the Inequities in* Berry v. Berry, 37 BAYLOR L. REV. 107, 136 (1985) (footnote and italics omitted).

### 3. Texas Family Code Section 3.007

In 2005, the Texas legislature passed House Bill 410, codified as sections 3.007 and 3.008 in the Texas Family Code. *See* Act of May 24, 2005, 79th Leg., R.S., ch. 490, § 1, 2005 Tex. Gen. Laws 1353, 1353. Subsections (a) of section 3.007 provided as follows:

> (a)     A spouse who is a participant in a defined benefit retirement plan has a separate property interest in the monthly accrued benefit the spouse had a right to receive on normal retirement age, as defined by the plan, as of the date of marriage, regardless of whether the benefit had vested.

*Id.* Although this subsection was repealed in 2009,[4] it applies to suits for divorce that were pending at any time between September 1, 2005 and August 31, 2009.[5]

Because Bob petitioned for divorce in 2005 and the case was pending before these provisions were repealed, the characterization of benefits under the two defined-benefit plans at issue is governed by section 3.007(a).

Bob's arguments to avoid the statute's application can be disposed of quickly. He correctly notes that section 3.007(a) defines the separate-property interest of a "participant" in a defined-benefit plan. Reasoning that this subsection is inapplicable if he was not a "participant" in the plan at the time of his divorce, Bob selectively quotes language from various Shell benefit plans in an attempt to show that Shell used the word "participant" to refer only to current employees, and not to retirees. According to Bob,

---

[4] *See* Act of May 29, 2009, 81st Leg., R.S., ch. 768, § 11(1), 2009 Tex. Gen. Laws 1950, 1953.

[5] *Id.* § 13(a), 2009 Tex. Gen. Laws 1950, 1953. In the current version of section 3.007 of the Texas Family Code, there are no subsections (a) and (b). Inasmuch as there is no chance of confusion, we will refer to the repealed provisions simply as section 3.007(a) and section 3.007(b).

only those who are "eligible" can participate in these retirement plans, and only "employees" are eligible. He then reasons that one who is no longer an employee is not eligible to participate and therefore cannot be a "participant." Not only would this be an absurd construction of section 3.007(a), but Bob's premises are factually incorrect. Both the Benefit Restoration Plan and the Senior Staff Plan refer to "any participant, including one who is retired." Moreover, his own expert stated that Bob is a "participant." Bob also asserts that, as applied to him, 3.007(a) violates the state constitution and common-law precedent because it divests him of a portion of his separate property. This argument begs the question of whether a portion of the lump-sum distribution characterized as community property actually *is* his separate property. He additionally states that the way in which 3.007(a) was applied in this case conflicts with the express terms of the defined-benefit plans, but he refers us to no language from either plan that purports to mandate the way in which the lump-sum distribution of a defined benefit is characterized years after it was paid. Bob also argues that the statute as applied would be preempted by ERISA because it would cause a plan administrator to pay other than in accordance with plan documents, but cites no evidence that this is the case.

In an alternate argument, Bob contends that if section 3.007(a) applies, then we should it construe it as a codification of *Taggart*, but the statute will not bear such an interpretation. Under section 3.007(a), the working spouse has a separate-property interest in the "monthly accrued benefit," which requires a determination of the monetary value of the benefit that had accrued on a particular date. Value is stated in dollars and cents. *See Berry*, 647 S.W.2d at 945–46. In section 3.007(a), as in *Berry*, value is determined as of the date that the employed spouse's marital status changed. *Compare* TEX. FAM. CODE 3.007(a) (value is determined "as of the date of marriage") *with Berry*, 647 S.W.2d at 946–47 (value is determined as of the date of divorce). In contrast, value is not addressed in *Taggart* at all. *See Taggart*, 552 S.W.2d at 424 (reforming the judgment "to adjudge the correct fractional interest" to the non-working spouse). Instead, the *Taggart* formula is used to determine the extent of the community-property interest, which

11

is expressed as a fraction. *Id.* The value of retirement benefits on the date that the working spouse's marital status changed is the central feature of section 3.007(a), but forms no part of the *Taggart* formula. *See id.*

Although section 3.007(a) cannot be read as a codification of *Taggart*, it can be read as the legislature's attempt to extend *Berry* to cases in which employment predates marriage. Like *Berry*, section 3.007(a) requires the court to determine the value of the benefits that had accrued on the date that the working spouse's marital status changed, without regard to vesting. Both *Berry* and section 3.007(a) are consistent with the recognition that larger benefit increases are more likely to occur later in the working spouse's career. The difference between the two is that in *Berry*, marriage preceded employment, whereas section 3.007(a) deals with situations in which employment preceded marriage. *See* House Comm. on Juvenile Justice & Family Issues, Bill Analysis, Tex. H.B. 410, 79th Leg., R.S. (2005) (stating that section 3.007(a) "sets forth a mechanism for Texas courts to apply the *Berry* case in the various situations that may arise").

Thus, as we understand it, the legislature's intent in enacting this provision was to require that in those cases in which employment precedes marriage, courts must use the same accrued-benefit method to calculate the value of the separate-property interest that they would use to calculate the community-property interest in cases in which marriage precedes employment. In both, the value of an interest is the amount of the benefits that hypothetically would have been payable if the employed spouse retired on the date of the marital-status change and there had been no further requirements for the benefits to vest or mature. *See* Brown, 37 BAYLOR L. REV. at 122 ("'Accrual of benefits' refers to the specific dollar amount credited or allocated to the individual plan participant at a given point in time.").

12

We therefore conclude that the trial court did not abuse its discretion by instructing the jury in accordance with the statute or by charging the jury to state the amount of Bob's separate-property interest in dollars and cents rather than as a percentage. We overrule Bob's second issue.

### 4. Application to the Lump-Sum Distribution

To evaluate Bob's argument that his separate-property interest in the lump-sum distribution is larger than the $1,807,509 found by the jury, we consider the benefits that had accrued under the two plans involved as of the date of his marriage. *See* TEX. FAM. CODE. ANN. § 3.007(a). The lump-sum distribution consisted of payments under the Shell Senior Staff Plan and the Benefit Restoration Plan, both of which are defined-benefit plans; thus, section 3.007(a) applies.

It is undisputed that the Benefit Restoration Plan was created after Bob and Deborah married. Consequently, all of the benefits that this plan provides can be presumed to be community property. *See* TEX. FAM. CODE ANN. § 3.002 (all property acquired during the marriage is presumed to be community property). To overcome this presumption, Bob asserts that the Benefit Restoration Plan simply restored benefits that were lost as a result of the 1986 Tax Reform Act. This is so, he argues, because payments under Shell's defined-benefit plans are based in part on the employee's compensation, but the Act imposed a cap on the compensation that could be considered in determining the amount of the defined benefit. After the passage of the 1986 Tax Reform Act, Shell established the Benefit Restoration Plan to return the total amounts payable under its pension plans to the amount that would have been payable without the statutory cap. Shell further made this plan retroactive to 1984. Bob contends that the theories of inception-of-title, replacement-for-loss, mutation, and tracing all support his position that the benefits he became entitled to receive under this plan after his marriage nevertheless are his separate property.

13

The problem with these arguments is that before his marriage, Bob's salary was already below the cap imposed by the 1986 Tax Reform Act. Because the Act did not reduce the benefits that Bob was entitled to receive on the date of his marriage, it cannot be said that the Benefit Restoration Plan "restored" anything to him.

As for the Senior Staff Plan, Bob presented no evidence that that this plan existed before Bob's marriage in 1985. Shell's representative dated the plan's inception to the 1990's, and the plan administrator identified 1991 as the year when Bob first began to participate in it. Thus, the benefits it provides also can be presumed to be community property.

In sum, we conclude that section 3.007(a) applies to the characterization of the payments under Bob's defined-benefit plans; that the trial court correctly instructed the jury accordingly; and that the trial court did not abuse its discretion by rejecting Bob's arguments that half of the benefits ultimately paid under these plans are his separate property. Because Bob failed to establish that the value of his separate-property interest is larger than the $1,807,509 found by the jury, we overrule Bob's first and third issues.

**B. Exclusion of Evidence of Separate-Property Interest in the Cash Deferral Program**

In his fourth issue, Bob challenges the trial court's imposition of discovery sanctions excluding all evidence that a portion of the payments due to him under Shell's Cash Deferral Program are his separate property. As a result of his participation in this program, Bob will receive an annual payment of $2,424,154 for ten years, for a total of $24,241,540. Bob argues that the trial court abused its discretion in excluding all evidence of his separate-property interest in these payments, including certain Shell documents, supplemental expert reports, and Bob's testimony on this point.

Under Texas Rule of Civil Procedure 193.6, if a party fails to timely make, amend, or supplement a discovery response, the undisclosed evidence or information is subject to

14

exclusion unless that party proves to the trial court that there was good cause for the failure or that the failure would not unfairly surprise or unfairly prejudice the other parties. TEX. R. CIV. P. 193.6(a), (b). We review the trial court's ruling under this rule for abuse of discretion. *See Fort Brown Villas III Condo. Ass'n v. Gillenwater*, 285 S.W.3d 879, 881 (Tex. 2009) (per curiam) (addressing exclusion of testimony of expert who was first designated three days before the end of discovery and more than five months after the expert-designation deadline).

### 1. Deadlines for Supplementing Expert Reports and Discovery Responses

The trial court entered an agreed docket-control order in September 2007, setting the case for trial on January 22, 2008. Under the terms of the order, expert reports were due on October 22, 2007 and rebuttal reports were due on November 12, 2007. All discovery was to be supplemented by December 21, 2007. On December 4 and 5, 2007, the parties were deposed, and Bob testified that he did not participate in the Cash Deferral Program until after he was married. On December 6, 2007, Bob's expert witness Patrice Ferguson was deposed. She stated that although she had not yet expressed it in an expert report, she had a preliminary opinion that some of the future payments under the Cash Deferral Program might be Bob's separate property. Counsel for Deborah did not ask for a dollar amount at the deposition because Ferguson characterized her opinion as preliminary.

On December 14, 2007, Ferguson produced a second supplemental expert report identifying for the first time the amount of the future payments under the Cash Deferral Program that Bob claimed as his separate property. Ferguson opined that $1,578,030 of each annual payment is Bob's separate property. On December 21, 2007, Bob incorporated this report by reference in his supplemental responses to discovery concerning the legal theories and factual bases of his claims, and he supplemented his interrogatory answers.

15

After Bob served the second supplemental expert report and supplemental discovery responses, Deborah's forensic-accounting expert James Penn produced a supplemental rebuttal report on December 28, 2007. Penn disagreed with Ferguson's calculations, acknowledged that part of the payment could be characterized as separate, but concluded that Bob had failed to establish by clear and convincing evidence what portion could be separate. At the January pretrial conference, the court granted Deborah's motion for continuance, setting the case for trial on March 10, 2008. The trial court also struck Ferguson's late-filed expert report, and prevented her from testifying on that issue.[6] Bob argued that resetting the trial date meant that the report was now timely. The court disagreed and noted on the docket sheet, "No deadlines changed at this time." The trial court also stated that although its order would preclude Bob's expert from testifying that Bob had a separate-property interest in the Cash Deferral Program's annual payments, the order did not apply to Bob's own testimony. This ruling changed on the second day of the trial in March 2008, when the trial court sustained objections to Bob's testimony on this issue. Bob made an offer of proof of Ferguson's testimony, his own testimony, and the excluded documents and reports.

## 2. Exclusion of Ferguson's Supplemental Report and Testimony

Bob contends that the trial court abused its discretion in excluding Ferguson's second supplemental expert report and her testimony concerning the additional opinions expressed in that report because (a) the sanction was not warranted by any discovery violation on his part, (b) his failure to supplement certain discovery before the discovery deadline was excusable for good cause, and (c) any late production of evidence did not unfairly surprise or prejudice Deborah. We disagree.

---

[6] The trial court signed a written order excluding the report and expert testimony on February 18, 2008.

Bob first argues that because the trial had been reset when the motion was heard, the evidence at issue was no longer subject to automatic exclusion under Rule 193.6. When the date of trial determines the date on which discovery must be supplemented, this would be true. *See H.B Zachry Co. v. Gonzalez*, 847 S.W.2d 246, 246–47 (Tex. 1993) (per curiam) (orig. proceeding) (discussing predecessor to Rule 193.6 and holding that party's failure to identify witnesses more than thirty days before trial as required by rule was not a basis for excluding their testimony where the trial was reset to another date more than thirty days later). *See also* TEX. R. CIV. P. 190.3(b)(1)(A) (all discovery must be conducted during the discovery period which continues until 30 days before the date set for trial in cases under the Family Code). However, Rule 190.3 does not apply if there is a written scheduling order under 190.4. *See* TEX. R. CIV. P. 190.3 (specifying that this rule applies only if Rule 190.2 and Rule 190.4 do not). Under Rule 190.4, the trial court may order that discovery be conducted in accordance with a discovery control plan tailored to the circumstances of the specific suit and may change any limitation on the time for or amount of discovery otherwise set forth in the Texas Rules of Civil Procedure. TEX. R. CIV. P. 190.4(a), (b).

Even though the trial court continued the case, the court made clear that the deadlines in the docket-control order remained in place. Under these facts, we conclude that the continuance did not reset the dates in the court order. *In re Carpenter*, No. 05-08-00083-CV, 2008 WL 384569, at *2 (Tex. App.—Dallas Feb. 18, 2008, orig. proceeding [mand. denied]) (mem. op.) (continuance does not nullify scheduling order set by court order).

Bob's failure to supplement the expert report in a timely manner also is not excusable for good cause. The stated reason for the delay was that his trial counsel did not appreciate the significance of two letters Deborah produced in 2005 until after Bob was deposed in December 2007. By that time, the deadline to supplement his expert's report

17

had passed. Inadvertence of counsel is not good cause for failure to adhere to discovery deadlines. *Alarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 915 (Tex. 1992).

Finally, Bob failed to show that his expert's new opinion did not unfairly surprise or prejudice Deborah. Ferguson did not identify the funds that Bob claimed as his separate property until after she and Bob had been deposed; until that time, it had been unnecessary for Deborah to prepare legal arguments or expert testimony regarding the character of the bonuses or the interest paid on them—amounts that together totaled more than $24 million dollars.

We conclude that the trial court did not abuse its discretion in excluding Ferguson's second supplemental expert report and her testimony regarding the opinions expressed in that report. We therefore overrule Bob's fourth issue as it pertains to this report and to Ferguson's testimony.

### 3. Exclusion of Bob's Testimony and Documentary Evidence Regarding the Cash Deferral Program

On the second day of trial, Deborah moved to exclude any evidence of Bob's separate-property interest in the Cash Deferral Program on the ground that he failed to timely supplement his discovery responses. In 2006, Deborah sent Bob an interrogatory asking him to identify the percentage of any property in the entire estate that he claimed as his separate property. Bob answered the interrogatory and supplemented several times. He always indicated that there might be a separate component to the Cash Deferral Program but never identified a percentage.

At trial, Deborah argued that Bob failed to timely supplement discovery because he did not identify the percentage of the payments under the Cash Deferral Program that he claimed as his separate property until the December 21, 2007 deadline to supplement discovery. The trial court sustained Deborah's objections to Bob's offered testimony on

the subject and to the two letters from Shell[7] on which Bob relied as support for his testimony. The trial court further explained that the ruling applied not only to Shell's letters, but also to "any testimony that would suggest or support a position that any asset in that plan is anything other than community property."

With regard to the exclusion of Bob's testimony and documentary evidence, we agree with Bob that Deborah waived her complaint by failing to obtain a pretrial ruling on the discovery dispute. *See Remington Arms. Co. v. Caldwell*, 850 S.W.2d 167, 170 (Tex. 1993) ("the failure to obtain a pretrial ruling on discovery disputes that exist before commencement of trial constitutes a waiver of any claim for sanctions based on that conduct"); *Mandell v. Mandell*, 214 S.W.3d 682, 691–92 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding that appellant who failed to move for the exclusion of evidence until the last business day before a summary-judgment hearing waived his complaint that the summary-judgment motion was based on evidence not produced in response to discovery).

Although Deborah contends that she did obtain a pretrial ruling, this is not supported by the record. At the hearing on the motion in limine, Bob's attorney expressed concern that part of the motion applied to Bob's own testimony. The next day, the trial court announced its ruling excluding Ferguson's second supplemental report and her testimony as to the characterization of the payments under the Cash Deferral Program and as to the value of Bob's separate-property interest in them. In announcing its ruling, the trial court stated that it was "granting the Motion in Limine with regard to experts" and that its ruling "should not be interpreted to mean that Mr. Sprague could not testify as appropriate, if discovery is in order, and if there are no other valid objections to his testimony." Thus, the record affirmatively shows that Deborah was aware of the dispute concerning Bob's non-expert evidence, but did not obtain a pretrial ruling.

---

[7] It was Deborah who originally produced these letters to Bob in 2005.

We must reverse the property division if the erroneous exclusion of this evidence probably caused the trial court to render an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1). Even in the absence of expert testimony, a reasonable jury could have found that the excluded evidence clearly and convincingly established that at least some of the funds payable through the Cash Deferral Program were Bob's separate property. We therefore agree that the error was harmful.

Bob asserts that a large part of the payments due under the Cash Deferral Program is attributable to a bonus declared approximately six weeks after his marriage. The evidence supporting Bob's claim included a letter from Shell dated February 21, 1985 offering Bob the option to defer payment of additional compensation if any should be awarded that year in connection with Shell's planned merger. Such compensation would then accrue interest at a rate of 17%, compounded annually, with payments to be made in ten installments beginning when he reached the age of 65. In his offer of proof, Bob testified that he made such an election. The excluded evidence also included a letter from Shell's CEO dated August 20, 1985, notifying Bob that he and the other Senior Staff members had been awarded bonus compensation. Shell's CEO stated, "This bonus will express our thanks to you in a tangible way for your contribution to the Company especially during the uncertainties of the past 18 months. Also I hope it will further encourage you to devote your maximum efforts towards ensuring the Company's continued success . . . ." Half of the bonus was payable immediately, and to encourage Bob's continued employment, one-quarter was payable in January 1986 and one-quarter payable in January 1987, contingent only upon his continued employment on those dates. Although the amount of the bonus is not stated in the letter, Bob testified that he was awarded $165,000. This is supported by another document from Shell tracking the principal and interest payable on deferred compensation. This document, which was not excluded from evidence, shows

that a deferred award of $82,500 was allocated to Bob on August 21, 1985, and payments of $41,250 were allocated to him in January 1986 and January 1987.[8]

Shell stated that the bonus with which Bob was credited in August 1985 was intended to compensate him for work done in the preceding eighteen months, but 16.5 of those months predated Bob's marriage. Thus, a reasonable jury could find that the value of Bob's separate-property interest in that payment is 16.5/18 x $82,500, or $75,625. According to the same letter from Shell, the payment of $41,250 credited to Bob in January 1986 was paid for his work in the same eighteen-month period and for his continued employment until this portion of the bonus was paid in January 1986. This portion of the bonus was credited on January 6, 1985; thus, it covered a period of 22.5 months, and Bob was single for 16.5 of those months. Based on this evidence, jurors could find that Bob's separate-property interest in that payment is 16.5/22.5 x $41,250, or $30,250. The last payment of $41,250 was credited on January 5, 1987, and was paid to compensate Bob for work performed in the eighteen-month period through August 20, 1985 and for his continued employment through January 5, 1987. Because Bob was single for 16.5 of those months, a jury could find that his separate-property interest in the January 1987 payment is 16.5/34.5 x $41,250, or $19,728.26. Thus, if allowed to consider the excluded evidence, a reasonable jury could have found that the evidence clearly and convincingly established that $125,603.26 of the initial $165,000 bonus is Bob's separate property. This bonus was deferred for payment until Bob reached age 65 and was guaranteed a 17% rate of return.

While Bob argues that he has established his separate property interest as a matter of law, the characterization of payments under the Cash Deferral Program involves questions of fact to be decided by the jury.[9] Because we cannot know how the jury would have

---

[8] There is no dispute regarding the amount of the Cash Deferral Program payments that are associated with each bonus; both forensic-accounting experts used the same numbers.

[9] The bonus we have discussed was not the only bonus that Bob elected to defer. It was simply the most well-documented, and thus, the one that most readily demonstrates how the erroneous exclusion of

weighed the evidence or the credibility of the various witnesses, we cannot determine the extent to which the original awards ultimately will be determined to be Bob's separate property, and thus, we do not reach the question of the proper characterization of the interest on any such payments.   We therefore sustain Bob's fourth and fifth issues as they pertain to the non-expert evidence of his separate-property interest in payments under the Cash Deferral Program, and remand for a new trial on that issue.

## IV.  POST-JUDGMENT SANCTIONS

Bob contends that if we reverse the property division, then we also must reverse the trial court's order imposing sanctions for Bob's alleged delay in transferring funds to Deborah after the court issued its rendition letter.   Because this is not necessarily so, we address the substance of his challenge to that order.   He argues that the trial court's failure to file findings of fact and conclusions of law is presumed harmful and requires reversal or abatement so that findings can be made.   In the alternative, Bob contends the sanction is not supported by legally or factually sufficient evidence or findings.

We begin our review by identifying the legal basis for the trial court's order. Sanctions are available under Chapter 9 of the Civil Practice and Remedies Code in certain suits for damages, but this statute does not apply to actions in which no party asserts a tort claim or a claim for damages based upon personal injury, property damage, or death.[10] Chapter 10 of the Civil Practice and Remedies Code authorizes sanctions against one who signs a frivolous pleading or motion,[11] and Texas Rule of Civil Procedure 13 permits sanctions against one who signs a groundless pleading or motion, but neither was the basis on which sanctions were sought.   Discovery abuses also can result in sanctions,[12] as can

---

Bob's separate-property evidence was harmful.

[10] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 9.002 (West Supp. 2011).

[11] *Id.* § 10.001 (West 2002).

[12] *See* TEX. R. CIV. P. 215.1–.5.

the failure to deliver copies of pleadings and motions to other parties to an action,[13] but neither were alleged in the motion that was granted here. We conclude that in sanctioning Bob for the delays in transferring funds to Deborah, the trial court must have relied on its inherent power.

Trial courts have inherent power to sanction "to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process, such as any significant interference with the traditional core functions of Texas courts." *McWhorter v. Sheller*, 993 S.W.2d 781, 789 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (citing *Kutch v. Del Mar Coll.*, 831 S.W.2d 506, 509–10 (Tex. App.—Corpus Christi 1992, no writ)). These core functions include "hearing evidence, deciding issues of fact raised by the pleadings, deciding questions of law, entering final judgment and enforcing that judgment." *Kutch*, 831 S.W.2d at 510. For the trial court to exercise its inherent power to sanction, there must be evidence and factual findings of significant interference with such functions. *McWhorter*, 993 S.W.2d at 789 (citing *Kutch*, 831 S.W.2d at 510). We review the trial court's imposition of sanctions for abuse of discretion. *Id.* at 788.

Although Bob timely filed a request for findings of fact[14] and a reminder that the sanctions findings were past due,[15] the trial court issued none—nor would the evidence support a finding that Bob engaged in bad-faith abuse of the judicial process. The record instead reveals the following chronology:

In its March 31, 2008 rendition letter, the trial court advised counsel for the parties of its judgment in the case and scheduled a hearing to be held on April 18, 2008 regarding the entry of judgment. In the letter, the trial court ordered that "[t]he Shell Senior Staff Savings Fund shall be sufficiently liquidated to net [Deborah] $4,561,575 . . . as

---

[13] *See* TEX. R. CIV. P. 21b.

[14] *See* TEX. R. CIV. P. 296 (requests for findings of fact must be filed within twenty days after the judgment is signed).

[15] *See* TEX. R. CIV. P. 297 (notice of past due findings of fact and conclusions of law must be filed within thirty days after filing the original request).

expeditiously as possible, and the court invites counsel to have Shell make a determination of timing on such liquidation so that specific orders may be included in the Decree of Divorce." On April 3, 2008, Bob's attorney Brenda Keen sent an email to Shell's counsel (with a courtesy copy to Deborah's counsel) requesting information about the timing and steps necessary for such liquidation. Shell's attorney advised Keen on April 15, 2008 that in response to his inquiries, he had been directed to the plan administrator's website.

On April 17, 2008, the hearing on the entry of judgment was postponed until May 2, 2008. At the hearing, Deborah's attorney stated that the funds had not yet been received, and Keen explained that, in accordance with the trial court's letter of March 31, 2008, she had asked for information from Shell about the timing of the liquidation. Keen also stated that she had advised Bob not to transfer any funds yet because a temporary injunction was still in effect. The following discussion then occurred:

> The Court: Okay, why don't we do this. Why don't we say I am instructing him to do, and I don't want to handwrite an order, I want to leave the language exactly like it is, and I can add notwithstanding any temporary injunctions or whatever you need it to say. If, so that's clear, that his effectuating this transaction is not a violation of the temporary injunction of this court. Does that work?
>
> Ms. Keen: I think we can sit and handwrite that order and submit it to him, and then we will know that he can start that process.
>
> The Court: I will sign that today, and that will take care of that . . . .

The trial court signed a handwritten "Order for Liquidation of Senior Staff Savings" stating that Bob "is authorized to initiate liquidation of a sufficient portion of the Shell Senior Staff Savings Fund to net [Deborah] $4,501,572.00 [16] notwithstanding any

---

[16] Although there is a discrepancy of $60,003 between the amount referred to in the trial court's order of May 2, 2008 and its rendition letter of March 31, 2008, Bob actually transferred to Deborah the larger amount identified in the rendition letter.

24

temporary orders or injunctions previously entered in this case." The same day that the order was signed, Keen notified Bob of the authorization, and Bob telephoned Fidelity, the plan administrator, and requested liquidation of $8,200,000. This amount was removed from the Senior Staff Savings Fund on May 2, 2008. According to Bob, a Fidelity representative initially told him that the funds would be transferred to his account on May 30, 2008, but on May 5, 2008, a Fidelity representative advised him that it was sending a check to his address of record, and it was expected to arrive the week of May 12, 2008. On May 7, 2008, Bob completed forms to be used by his brokerage to deposit the check and wire transfer funds to Deborah.

On May 27, 2008, Deborah's attorney advised Keen that the funds still had not been received. Keen responded that Bob had not received the check, although Fidelity reported that it mailed the check to him in London on May 7, 2008. On May 28, 2008, Bob received the check for $5,379,200.00, dated May 2, 2008. The envelope indicated the reason for the delay between the time the check was mailed and when it was received: although Fidelity sent the check from an address in Ohio to Bob's home in London, it paid only $0.41 for postage.[17] The same day that Bob received the check he sent it to his brokerage in Houston via overnight delivery with instructions to deposit it and wire transfer $4,561,575 to Deborah's account. The brokerage confirmed on May 29, 2008 that it had received the documents, deposited the check, and, after allowing time for the funds to clear, would wire transfer the requested funds to Deborah on June 4, 2008. The money was removed from Bob's account on June 4 and deposited in Deborah's account on June 5, 2008.

---

[17] We take judicial notice that on May 7, 2008, the postage for a one-ounce domestic first-class letter was $0.41 but the postage for a one-ounce letter sent to Great Britain via first-class mail international was $0.90. *Compare* New Standards for Domestic Mailing Services, 72 Fed. Reg. 15,365, 15,369 (Mar. 30, 2007) (postal rate for first-class domestic mail) *with* International Product and Price Changes, 72 Fed. Reg. 16,603, 16,607, 16,614 (Apr. 4, 2007) (postal rate for first-class mail international).

Based on our review of the record, we conclude that Bob was not required to begin liquidating funds from the Shell Senior Staff Fund before May 2, 2008, and the delay in transferring funds to Deborah after that date was not attributable to him. As the Texas Supreme Court has observed, "great delay in the delivery of a letter is the probable result of the omission to prepay the postage." *Blake v. Hamburg-Bremen Fire Ins. Co.*, 67 Tex. 160, 164, 2 S.W. 368, 370 (1886). We accordingly reverse the trial court's order of June 20, 2008 imposing sanctions. Our disposition of this issue renders moot the trial court's order of August 27, 2008, conditionally awarding Deborah attorneys' fees in the event of an unsuccessful appeal of the sanctions order.

## V. CONCLUSION

We find no error in the jury charge or in the trial court's failure to characterize as Bob's separate property a larger portion of the lump-sum distribution from two defined-benefit plans. Although the trial court did not abuse its discretion in excluding evidence of the untimely-disclosed opinions of Bob's forensic-accounting expert, we conclude that the trial court reversibly erred in excluding non-expert evidence that would have supported Bob's separate-property claim to some of the amounts payable to him under Shell's Cash Deferral Program, and in sanctioning Bob for a post-rendition delay in transferring funds to Deborah. We accordingly reverse both the property-division portion of the divorce decree and the post-judgment sanctions order. Because we conclude that the trial court did not err in characterizing $1,807,509 of the lump-sum distribution as Bob's separate property, we reverse and remand the case to the trial court for (a) a new trial as to the proper characterization of the amounts payable under the Cash Deferral Program, and (b) a just and right division of the community estate, in light of the new finding to be made concerning the characterization of the payments under the Cash Deferral Program,

and in light of the jury's findings on the remaining issues.   Given our disposition of these issues, we do not address Bob's remaining issues.[18]


/s/     Tracy Christopher
                   Justice


Panel consists of Chief Justice Hedges and Justices Frost and Christopher. (Frost, J., Concurring).

---

[18] In Bob's sixth issue, he argues that the trial court erred in making findings of fact contrary to those made by the jury.   Specifically, the jury found that Bob was not guilty of cruel treatment toward Deborah of a nature that rendered further living together insupportable, and found that the tax liability that would be incurred in liquidating certain items would be the same regardless of whether those items were awarded to Bob or Deborah.   Neither Bob nor Deborah challenged either of these findings in the trial court or on appeal.   Even if the trial court erroneously included contrary statements among the findings of fact and conclusions of law it issued in connection with the judgment previously rendered in this case, any such error is now moot, because that judgment has been reversed.   We clarify, however, that the issues resolved by these particular findings by the jury do not need to be tried on remand.   If the trial court again makes findings contrary to the jury verdict, that point of error can be raised again, if necessary.