IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 3, 2021

## IN RE BRITTANY W., ET AL.

**Appeal from the Juvenile Court for Cocke County**
**No. TPR-04796      Brad Lewis Davidson, Judge**

_____

### No. E2020-01631-COA-R3-PT

_____

This appeal concerns the termination of a mother's parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Cocke County ("the Juvenile Court") seeking to terminate the parental rights of Jamie W. ("Mother") to her minor children, Brittany W. and Isaiah W. ("the Children," collectively). After a hearing, the Juvenile Court entered an order terminating Mother's parental rights on three grounds. Mother appeals, arguing that termination of her parental rights is not in the Children's best interest. We find, first, that the grounds found against Mother were proven by clear and convincing evidence. We find further, also by clear and convincing evidence, that termination of Mother's parental rights is in the Children's best interest. We affirm the Juvenile Court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Tammy N. Barry, Kodak, Tennessee, for the appellant, Jamie W.

Herbert H. Slatery, III, Attorney General and Reporter, and Amber L. Seymour, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

## OPINION

## Background

Brittany was born to Mother in November 2006; Isaiah, in May 2011. DCS became involved with this family in September 2019 when it filed an application in the Juvenile Court for an *ex parte* order allowing it to investigate the family's home.[1] The Children were living then with their maternal grandfather. DCS was acting on a referral alleging child drug-exposure, environmental neglect, psychological harm, and lack of supervision. The Juvenile Court subsequently entered an *ex parte* order allowing DCS to investigate, requiring Mother and the grandfather to admit DCS into the home in order to examine it.

In October 2019, the Juvenile Court ordered the Children into DCS temporary custody. The Juvenile Court found that having the Children remain in the home was contrary to their welfare due to "concerns regarding the Children receiving proper medical and educational care, as well as non-compliance with this Court's Order." The Juvenile Court stated further that reasonable efforts had been made by DCS to prevent removal by "attempting to investigate the family to provide services if required." DCS then filed a petition to have the Children adjudicated dependent and neglected. Following a hearing in February 2020, the Juvenile Court entered an order adjudicating the Children dependent and neglected. In its order, the Juvenile Court stated: "[Maternal grandfather] reported he could not care for a teenage girl. The parents did not appear today. Mother is charged with constructive notice of the hearings."

On June 4, 2020, DCS filed a petition seeking to terminate Mother's parental rights to the Children. DCS alleged three grounds against Mother: (1) abandonment by failure to support; (2) abandonment by failure to visit; and (3) failure to manifest an ability and willingness to assume custody. DCS alleged further that termination of Mother's parental rights is in the Children's best interest.

DCS's petition was tried before the Juvenile Court in November 2020. Mother did not appear, but she was represented by counsel. DCS case manager Jessica Dockery ("Dockery") was the sole witness to testify. Dockery had managed the Children's case since they entered state custody in October 2019. During that period, Mother communicated with Dockery some six or seven times. The last message Dockery received from Mother was sent in January 2020. Dockery did not hear from Mother again until September 22, 2020 when Mother showed up at the first scheduled hearing date on the petition (which then was continued to November). When Dockery was able to communicate with Mother, which generally occurred through Facebook, she informed

---

[1] The Children's father, James W., has surrendered his parental rights. He is not a party on appeal.

Mother about visitation dates. However, Mother never visited the Children during the custodial period. Dockery testified that Mother had not seen the Children at all since they entered DCS custody. Dockery stated that she continued in vain to try to contact Mother after communications between them stopped in January 2020.

Continuing her testimony, Dockery stated that she was unaware of Mother ever having paid any child support. Dockery testified that, before DCS filed its petition, she had reviewed records from the Department of Human Services and found no evidence Mother paid any child support whatsoever. Dockery testified further that Mother tested positive for methamphetamine and amphetamine based on a mouth swab drug test performed on September 22, 2020. Mother did not complete any other drug screens in the custodial period. Dockery stated that she did not know where Mother was living as of trial. Mother never allowed Dockery to inspect any residence of Mother. On September 22, 2020, Mother gave Dockery an address for where she was living. However, Dockery did not inspect that residence, as Mother told her "that was her grandmother's home and not where she would be wanting the kids to return to." According to Dockery, Mother also told her "she was not in the position to have the children back in the home at this time." Regarding where the Children were placed, Dockery stated that they were living in a DCS foster home in Hamblen County. This was not a pre-adoptive home and DCS was still in the process of looking for a pre-adoptive home for the Children. Asked how the Children felt about being adopted, Dockery testified: "They both want to be adopted. Brittany is more vocal about the adoption versus Isaiah. Brittany has actually written a letter to her mother and myself, and she also wanted to make sure that Judge Davidson had a copy of that letter." Brittany's letter was entered into evidence. In her letter, Brittany stated that she did not want to live with Mother, and wanted to be adopted. Brittany referenced Mother's drug use and lack of a home. Brittany urged Mother to "sign your rights over." Brittany concluded by stating that she loved Mother but did not want to see her "without supervision." Asked how the Children were doing, Dockery testified "exceptionally well." However, Isaiah, age nine, had some struggles in school about not wanting to do his homework. As to Brittany, she was "excelling in school" and her medical needs were being met. Dockery testified that on September 22, 2020, she tried to persuade Mother to get started on services geared toward possible reunification with the Children but Mother shunned her. Dockery testified that, in her view, termination of Mother's parental rights would be in the Children's best interest.

On cross-examination, Dockery acknowledged that Mother participated in a "legal risk meeting" on September 23, 2020. Asked about her unsuccessful attempts to stay in contact with Mother, Dockery stated that she used the numbers Mother gave her. In addition, Dockery checked jail rosters to see if Mother was incarcerated somewhere. Regarding drug screens, Dockery stated that Mother had refused a hair follicle test. Asked

if either child still loved Mother, Dockery stated: "Both children will tell you that they still love their mother. However, they feel that they would be better off being adopted."

In November 2020, the Juvenile Court entered an order terminating Mother's parental rights to the Children. The Juvenile Court found, by clear and convincing evidence, that three grounds for termination of parental rights were proven against Mother: (1) failure to visit; (2) failure to support; and (3) failure to manifest an ability and willingness to assume custody. The Juvenile Court found further, also by clear and convincing evidence, that termination of Mother's parental rights is in the Children's best interest. In its parental rights termination order, the Juvenile Court stated, in part:

> Mother's [participation] in her children's lives over the past year has been abysmal. CM Dockery, the only witness to testify, stated that she had perhaps six communications from Mother during the 13 months that this matter has been open. CM Dockery reported that she could initially reach the Mother over Facebook, but that with time, all communication had died out until she appeared at the hearing on September 22, 2020. At that time, CM Dockery stated that she had a few more communications with the Mother, arranged several services to begin immediately, and provided a drug screen for Mother. However, Mother failed to maintain communication past the second day after her miraculous return, failed her drug screen for methamphetamine, and refused to cooperate with services provided by DCS, despite the quick and efficient turnaround and the willingness of DCS to work with her this late in the termination process.
>
> The Court heard unrefuted testimony from CM Dockery that Mother had not paid child support and had not visited with the children during the four-month period prior to filing. This Court finds that from February 4, 2020, to June 3, 2020, the Mother had no[] contact with the children and paid nothing towards their support. It is apparent from this lack of care for the children's welfare and her own relationship with them that Mother had no ability or willingness to parent the children. In addition, based on her recent failed drug screen for methamphetamine coupled with her lack of housing, the Courts finds that the children would not be safe if placed back with the Mother at this time.
>
> While the Court understands that the children will be moving to a new, pre-adoptive home, and therefore some change for them is inevitable, it is this Court's explicit finding that taking them from a stable home and placing them with Mother who is currently without adequate housing, would be detrimental to their health. The children have no relationship with their Mother; although CM Dockery admitted that they do still love her, she also reported to the Court that the children, and particularly Brittany, are adamant

that they not return home to their Mother.  In addition, the Court heard ample testimony that the Mother has not made any changes to her lifestyle and that she would be an unfit parent for the children due to her continued drug use. Brittany's letter in particular was proof positive that Mother's continued relationship with the children only harms them psychologically and does nothing more for them than prevent them from obtaining a permanent placement with loving, adoptive parents.

\*\*\*

[Failure to Visit]

The Court finds that, at the time of the filing of the Petition, the Mother has failed to visit the children.  DCS filed its Petition to Terminate Parental Rights on June 4, 2020, making the relevant statutory time period between February 4, 2020, and June 3, 2020.  During this time period, the Court finds that Mother visited the children zero times.  The Court further finds that Mother has never visited the children during their time in state's custody.

The Court finds that Mother was in no way incapacitated or prevented from visiting with the children during the four month period.  The Court finds that the Respondent knew of her duty to visit because such was addressed in the underlying Dependency and Neglection Petition with which Mother was served; DCS also attempted to set up visitation for her and the children, but Mother did not attend.

\*\*\*

[Failure to Support]

The Court finds that at the time of the filing of the Petition, Mother has failed to support the children.  DCS filed its Petition to Terminate Parental Rights on June 4, 2020, making the relevant statutory time period between February 4, 2020, and June 3, 2020.  During this time period, the Court, finds that [Mother] has made zero payments towards the support of these children.

The Court finds that Mother was in no way incapacitated or prevented from supporting the children during the four month period.  The Court finds that Mother knew of her duty to support because such was addressed in the underlying Dependency and Neglect Petition with which Mother was served.

***

[Failure to Manifest an Ability and Willingness to Assume Custody]

The Court finds that in the time since the children have come into state's custody the Respondent manifested no willingness nor ability to parent the children. Mother has not visited with the children and has not made an effort to maintain contact with DCS to work services. In addition, when Mother did appear on September 22, 2020, and CM Dockery asked her about her living situation and if she could come out and see the [home] to determine if it could be appropriate for the children, Mother responded that she was not ready for the children to come live with her there and that she would be attempting to find new housing. In addition, when Mother was provided an opportunity to participate in a Child and Family Team Meeting or to participate in a parenting assessment to start working the plan, Mother was notably absent.

As to whether or not the children would be safe if returned to Mother's custody, as recently as September 22, 2020, Mother failed a drug screen for methamphetamine. In addition, she self-reported to CM Dockery that her home was not appropriate for the children and that she would be seeking a new residence. At this time, the Court is unable to say for sure that Mother even *has* housing; it would be unsafe, therefore, to release the children to her without knowing the situation into which they would be released.

***

[Best Interest]

The Court carefully considered the factors as enumerated in Tennessee Code Annotated §36-1-113(i) in regards to the best interest of the child and finds that the factors weigh in favor of a finding by clear and convincing evidence that terminating the parental rights of Mother is in the best interest of the children.

Pursuant to §36-1-113(i) and associated case law such as *White v. Moody*, 171 S.W.3d 919 (Tenn. Ct. App. 2004) and *In Re Giorgianna H.*, 205 S.W.3d 508 (Tenn. Ct. App. 2006), once a parent has been found to be unfit, the interests of the parent and the child diverge. The focus of the proceeding shifts to the best interest of the child.

The Court finds the following in regards to each of the factors enumerated in §36-1-113(i) by a preponderance of the evidence:

(1) There is no evidence that Mother has made any changes in her life. CM Dockery testified that she had not taken advantage of services over the past two months despite CM [Dockery's] diligent attempts to have services arranged. In addition, Mother continued to test positive for illicit substances as recently as September 22, 2020.

(2) The Court finds that DCS made beyond reasonable efforts for Mother in the short time that she remained in communication, in particular over the past two months. CM Dockery arranged for a wide array of services in a short amount of time, but Mother was not willing to work the plan or put forth any effort in this short time.

(3) As stated above, Mother has not visited with the children in the entirety of the time that they have been in DCS custody.

(4) The Court finds that there is a relationship between the children and Mother; however, the relationship is negative and only causes unreasonable psychological harm to the children. Brittany wrote a letter to the court that was particularly disheartening as she displayed an unhealthy knowledge of her Mother's ongoing drug use.

(5) The Court finds that it would be particularly harmful for either child to be placed back in the same situation from which they were originally removed. There could be no benefit from placing the children with the Mother or even allowing her to have continued contact.

(6) This Court usually does not find this ground because of the evidence that would be required to show psychological harm; however, the Court, in considering the letter that Brittany obviously felt compelled to write regarding her Mother's drug use and the concerns that she would have with going home with Mother, warrant a finding in this case that Mother's behaviors have negatively psychologically impacted the children in this matter, especially Brittany.

(7) Based on testimony from this hearing, the Court cannot even say for sure that Mother has a home, let alone one to which the children could safely return; quite the contrary, it was undisputed in testimony that even Mother did not think that her housing would be appropriate for the children.

(8) Although Mother does continue to use methamphetamine as recently as September of this year, this Court does not find that this factor particularly weighs in favor of termination at this time.

(9) As stated above, this Court finds that Mother has not paid any support for the children at this time.

Mother timely appealed to this Court.

**Discussion**

Although not stated exactly as such, Mother raises a single issue on appeal: whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Children's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[2] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

-8-

of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### *B. Standards of Appellate Review*

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P.

---

[4] Tenn. Code Ann. § 36-1-113(i).

13(d).  *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246.  Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise.  *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).  In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights.  *In re Bernard T.*, 319 S.W.3d at 596-97.  The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness.  *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810).  Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.  *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).  Clear and convincing evidence supporting any single ground will justify a termination order.  *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Mother does not challenge any of the three grounds found against her.  Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal."  *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted).  Therefore, we will review each of the three grounds found against Mother.  The grounds at issue are set out in statute as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g).  The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

\*\*\*

-11-

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child;

Tenn. Code Ann. § 36-1-113(g) (Supp. 2020).[5]

Two different types of abandonment are at issue on appeal—failure to visit and failure to support. They are defined by statute as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

\*\*\*

(B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;

(C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;

(D) For purposes of this subdivision (1), "failed to support" or "failed to make reasonable payments toward such child's support" means the failure, for a period of four (4) consecutive months, to provide monetary support or

---

[5] We apply the parental rights termination statutes as they were in effect on June 4, 2020, the date the petition was filed.

-12-

the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period;

(E) For purposes of this subdivision (1), "failed to visit" means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period;

\*\*\*

(H) Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children;

(I) For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure;

Tenn. Code Ann. § 36-1-102(1) (Supp. 2020).

We first address whether the Juvenile Court erred in finding the ground of failure to visit. As found by the Juvenile Court, the relevant statutory period is February 4, 2020 through June 3, 2020. The Juvenile Court found that Mother failed to visit the Children during this period and indeed throughout the whole custodial period. Mother has not asserted the affirmative defense of lack of willfulness. The evidence does not preponderate against the Juvenile Court's findings relative to this ground. We find, as did the Juvenile Court, that the ground of abandonment by failure to visit was proven by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of failure to support. Again, the relevant statutory period is February 4, 2020 through June 3, 2020. The Juvenile Court found that Mother failed to provide any support for the Children during the statutory period. Mother has not asserted the affirmative defense of lack of willfulness. The evidence does not preponderate against the Juvenile Court's findings relative to this

-13-

ground. We find, as did the Juvenile Court, that the ground of abandonment by failure to support was proven by clear and convincing evidence.

Concluding our review of grounds, we address whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume custody. With respect to this ground, our Supreme Court has explained that "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (emphasis in original). The second prong of the statute requires us to consider whether placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. The Juvenile Court found that Mother failed to manifest either the ability or the willingness to assume custody of the Children. The Juvenile Court found further that returning the Children to Mother would be unsafe in view of her recent positive drug screen for methamphetamine, her self-report that her home was not appropriate for the Children, and the open question as to whether Mother has any housing at all. These findings reflect a risk of substantial harm to the Children's physical or psychological welfare were they to be placed with Mother. The evidence does not preponderate against the Juvenile Court's findings relative to both prongs of this ground. We find, as did the Juvenile Court, that the ground of failure to manifest an ability and willingness to assume custody was proven by clear and convincing evidence.

The final issue we address, and the sole issue raised by Mother, is whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Children's best interest. In making a best interest determination, courts consider a number of non-exclusive factors set out in statute as follows:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

-14-

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2020).

Mother argues that the Juvenile Court erred in finding that termination of her parental rights is in the Children's best interest. Mother contends specifically that the Juvenile Court erred in its findings as to best interest factors (4), (5), and (6). Mother argues that she had a meaningful relationship with the Children, particularly Brittany; that the Children are not placed in a pre-adoptive home and face being uprooted; and that there was insufficient proof showing Brittany suffered psychological harm and no evidence at all regarding psychological harm to Isaiah.

The Juvenile Court found that, while Mother and the Children have a relationship, the relationship is of a negative nature. In making this finding, the Juvenile Court stated that Brittany's letter was "particularly disheartening." Indeed, it was. In her letter, Brittany expressed love for Mother and held out the possibility of seeing her again after she reached majority age. However, Brittany also was clear that she wanted to be adopted and urged Mother not to fight the proceedings against her. Brittany referred to Mother's drug use and

lack of a home. Beyond Brittany's letter, it is difficult to characterize Mother and the Children's relationship as "meaningful" when Mother never once visited the Children throughout the entire custodial period. Mother offered no explanation for this failure.

With regard to Mother's point that the Children are not in a pre-adoptive home, she is correct in that it is a less than ideal arrangement. The sooner the Children achieve permanency, the better. However, the evidence reflects that the Children are, for the most part, doing well in their placement. Moreover, the fact that the Children are not yet in a pre-adoptive home in no way means that a return to Mother's care would be in their best interest. Mother has failed to visit or support the Children. She tested positive for methamphetamine and has no housing to speak of. Mother failed to stay in contact with DCS. In effect, Mother vanished for much of the case. In no sense would a return to Mother's care inure to the Children's best interest more so than their current placement, even if the Children will not remain in it permanently.

Lastly, Mother contends that Brittany's letter, in itself, does not constitute sufficient evidence that Brittany was psychologically harmed by Mother. Mother notes further that there is no mention as to whether Isaiah suffered any psychological harm. Mother observes that no expert testimony or medical evidence was introduced as to psychological harm to either child. We do not believe the Juvenile Court erred in its interpretation of Brittany's letter, which reflects the child's grappling with her love for Mother but also her desire to be adopted. However, even if Mother is correct and the Juvenile Court misapplied this particular factor with respect to psychological harm, the overwhelming weight of the best interest analysis still favors termination of Mother's parental rights. Mother has been absent in the lives of the Children. Mother has done nothing to show she is able or willing to parent the Children.

The evidence does not preponderate against the Juvenile Court's findings relative to the Children's best interest. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Children's best interest.

## Conclusion

The judgment of the Juvenile Court terminating Mother's parental rights is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Jamie W., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-16-